599 So.2d 1058 (1992)
Outher COLE, et al.
v.
CELOTEX CORPORATION, et al.
Nos. 91-C-2531, 91-C-2539.
Supreme Court of Louisiana.
May 28, 1992.
Rehearing Denied June 30, 1992.
*1059 William B. Baggett, William B. Baggett, Jr., and Rebecca Sue Young, Baggett, McCall & Burgess, Lake Charles, for applicants.
William T. McCall, Robert E. Guillory, Guillory & McCall, Lake Charles, Dermot S. McGlinchey, Victoria K. McHenry,
*1060 James M. Garner, Martha M. Young, McGlinchey, Stafford, Cellini & Lang, New Orleans, Richard M. Shusterman, David E. Sandels, Jr., Patricia A. Henry, White and Williams, Philadelphia, Pa., James L. Pate, Laborde & Neuner, Lafayette, Richard N. Dicharry, Stephen P. Hall, Phelps Dunbar, New Orleans, David L. Hoskins, Scofield, Gerard, Veron, Hoskins & Soileau, Lake Charles, Michael T. Cali, Gerald J. Talbot, Lemle & Kelleher, J. Michael Johnson, Galloway, Johnson, Tompkins & Burr, New Orleans, Thomas M. Bergstedt, Scofield, Bergstedt, Gerard, Mount & Vernon, Kenneth R. Spears, Jones, Tete, Nolen, Hanchey, Swift & Spears, Lake Charles, Maria I. O'Byrne Stephenson, Jesse R. Adams, Jr., Adams & Johnson, New Orleans, Christopher P. Ieyoub, Plauche, Smith & Nieset, Lake Charles, Robert E. Kerrigan, Jr., A. Wendel Stout, III, Janet L. MacDonell, Marc J. Yellin, Gary B. Roth, Deutsch, Kerrigan & Stiles, Lawrence G. Pugh, III, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, and Vance Edward Ellefson, Ellefson, Pulver & Staines, Metairie, for respondents.
Gary Allen Lee, Faris, Ellis, Cutrone & Gilmore, New Orleans, for Underwriters at Lloyd's London Co., amicus curiae.
Brian Carl Bossier, Robert Edgar Caraway, III, and Robert E. Williams, IV, Metairie, for J. Melton Garrett, George Kelmell, Peter Territo, Steven Kennedy, Albert Bossier, Edward Blanchard, Ollie Gatlin Edwin Hartzmann, John Chantrey, Charles Calzada, and Paul Tregre, Jr., amici curiae.
Edward John Lilly, Dymond, Crull, Castaing & Lilly, New Orleans, for Uniroyal Inc., amicus curiae.
Rockne Locke Moseley, Lea, Plavnicky & Moseley, New Orleans, for McDermott Inc., amicus curiae.
Charles S. McCowan, Jr., Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, for Louisiana Chemical Ass'n, amicus curiae.
Carey J. Guglielmo and Daniel Joseph Balhoff, Mathews, Atkinson, Guglielmo, Marks & Day, Baton Rouge, for Dow Chemical Co., amicus curiae.
HALL, Justice.
This case involves injuries to workers caused by long-term exposure to asbestos at their workplace, and presents several significant issues of law upon which a divergence of opinion exists among our state and federal courts.[1] Plaintiffs, three workers, and defendant, the insurer of plaintiffs' employer's executive officers, both filed writ applications. We granted both writs[2] to consider three principal issues:[3] (1) whether the law to be applied in allocating liability among the parties to the instant suit is comparative, or pre-comparative, fault;[4] (2) whether, assuming pre-comparative fault law applies, the virile share of the nine executive officers found at fault should be considered as one single share or as nine separate shares; and (3) whether the coverage provided by the defendant-insurer *1061 can be "horizontally stacked."[5]

I.
In December 1987, plaintiffs, Wilson J. Cormier, Dewey Derouen and John Perry, three former workers at the Cities Service refinery in Calcasieu Parish, commenced suit, claiming damages for injuries caused by long-term exposure to asbestos at their workplace.[6] Plaintiffs named as defendants, among others, Insurance Company of North America ("INA"), as the primary liability insurer of certain Cities Service executive officers,[7] and eleven manufacturers of asbestos-containing products.[8]
In their petition, plaintiffs asserted multiple theories of liability against the manufacturer-defendants, including the full gamut of products liability claims. While not directly joined as defendants, eleven Cities Service employees were alleged by plaintiffs to be executive officers.[9] Plaintiffs alleged that these purported executive officers negligently failed to provide them with a safe workplace between 1945, the year they began work,[10] and 1976, the year the Louisiana legislature amended LSA-R.S. 23:1032 of the Louisiana Worker's Compensation Law to eliminate negligence suits against executive officers of corporate employers.[11] INA filed cross-claims against the manufacturer-defendants seeking contribution.
In November 1989, on the eve of trial, plaintiffs settled with the manufacturer-defendants, and the trial judge dismissed INA's cross-claims as no longer viable. Thus, the case was tried against INA as the sole defendant. Nonetheless, it was stipulated that during plaintiffs' employment at Cities Service, they were exposed at the workplace to the manufacturer-defendants' asbestos-containing products, that the manufacturer-defendants' asbestos-containing products were unreasonably dangerous per se and that the manufacturer-defendants were all legally at fault in causing plaintiffs' asbestos-related occupational diseases. It also was stipulated that INA's coverage during the relevant years ranged from a low of $10,000 to a high of $50,000 per accident and/or occurrence.
After a two-week trial, the jury found that nine of the purported Cities Service executive officers were negligent in failing to provide plaintiffs with a safe workplace in every year from 1945 through 1976, inclusive, and awarded damages in the amount of $300,000.00 to each plaintiff. Pursuant to the district court's instruction that they apply comparative fault law in apportioning liability, the jury allocated fault 95% to the nine executive officers and *1062 5% to the eleven manufacturer-defendants. The jury also specifically was questioned as to whether any of the plaintiffs were contributorily negligent, and answered "No." The jury, however, did not decide the issue of insurance coverage; before trial, INA and plaintiffs agreed that the trial judge would decide that issue.
On the insurance coverage issue, the trial judge held that INA provided coverage for the nine negligent executive officers. Rendering written reasons for judgment on this issue, the trial judge concluded:
[P]laintiffs were exposed to different levels of asbestos dust at different times, under a variety of conditions, and at diverse job sites. Furthermore, plaintiffs belonged to different crafts and worked in different crews, and their exposures were scattered and varied throughout the refinery. There was no evidence that plaintiffs were together day in and day out, and this Court will not assume that plaintiffs' injuries were the result of similar occurrences at similar locations. Thus, it is appropriate to consider the harm visited upon each plaintiff as being a separate event, and to consider the event as occurring each year.
Based on the jury's finding that the executive officers were 95% at fault, the trial judge rendered judgment against INA, and in favor of plaintiffs, in the amount of $285,000.00 per plaintiff, plus legal interest. The trial judge further found that more than one of the INA policies were triggered and that the triggered policies were more than sufficient to satisfy each plaintiff's judgment, rendering it unnecessary to allocate the judgments among the policies at risk. From that judgment, INA appealed, raising thirteen assignments of error.
On appeal, the Third Circuit reversed the district court's finding that comparative fault law applied, accepting INA's argument that the case is governed by pre-comparative fault law. Applying pre-comparative fault (virile share) law, the Third Circuit found that there were a total of twenty virile shares, comprised of the eleven released manufacturer-defendants and the nine executive officers, and reduced each plaintiff's $300,000.00 award against INA by 11/20ths to $135,000.00, with interest from the date of judicial demand in this case in state court. The Third Circuit further found that INA's annual policies covering each plaintiff's exposure could be horizontally stacked and concluded, as did the district court, that there was "more than sufficient coverage for each plaintiff's award." The Third Circuit made one other minor amendment to the district court's judgment,[12] and otherwise affirmed. Cole v. Celotex Corp., 588 So.2d 376 (La.App.3rd Cir.1991). From that judgment, both the plaintiffs and INA applied for writs. As outlined above, we granted both applications to consider a number of issues. 592 So.2d 401 (La.1992). For the reasons detailed below, we find that the Third Circuit correctly resolved all the issues considered herein and affirm.

II.
As noted, the first issue is whether the provisions of the Louisiana Comparative Fault Law, which was enacted by Act 431 of 1979 and which became effective on August 1, 1980, apply to the instant case commenced after the Act's effective date.[13] At the outset, we observe that this issue has two facets: (i) whether plaintiffs' direct claims are governed by pre-Act contributory negligence, or post-Act comparative fault, law; and (ii) whether the allocation of *1063 fault among the defendants who are found to be solidarily liable is governed by pre-Act virile share, or post-Act comparative fault, law.[14]

A. PROSPECTIVE APPLICATION OF ACT 431
"Prospective operation of statutes is a general rule and, as a general rule, it is respected by the courts." Dixon, Judicial Method in Interpretation of Law in Louisiana, 42 La.L.Rev. 1661, 1665 (1982). Planiol aptly articulates the rationale behind this general rule: "a fact and an act are governed by the law under whose aegis they took place.... [T]he solution cannot change on account of the circumstance that when the court rules, the law governing such a fact or such an act is no longer the same." 1 M. Planiol, Treatise on the Civil Law,  243A (La.St.L.Inst.Trans.1959).
This general rule against retroactive application of legislative enactments, and the exceptions thereto, is codified in LSA-C.C. Art. 6, which is the governing rule of statutory construction applicable in this case.
In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretive laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary.
LSA-C.C. Art. 6; See also LSA-R.S. 1:2 (stating that no statute may be applied retroactively unless it is expressly so stated).
LSA-C.C. Art. 6 requires that we engage in a two-fold inquiry. First, we must ascertain whether in the enactment the legislature expressed its intent regarding retrospective or prospective application. If the legislature did so, our inquiry is at an end. If the legislature did not, we must classify the enactment as substantive, procedural or interpretive. See Lavespere v. Niagara Machine & Tool Works, Inc., 910 F.2d 167, 182 (5th Cir.), reh'g denied, 920 F.2d 259 (5th Cir.1990), citing Ardoin v. Hartford Accident & Indem. Co., 360 So.2d 1331, 1338-39 (La.1978).
Generally, the determinative point in time separating prospective from retroactive application of an enactment is the date the cause of action accrues.[15] Once a party's cause of action accrues, it becomes a vested property right that may not constitutionally be divested. Crier v. Whitecloud, 496 So.2d 305, 308 (La.1986); Faucheaux v. Alton Ochsner Medical Foundation Hospital and Clinic, 470 So.2d 878, 879 (La.1985); Lott v. Haley, 370 So.2d 521, 524 (La.1979); Burmaster v. Gravity Drainage District No. 2, 366 So.2d 1381, 1387 (La.1978); Marcel v. Louisiana State Department of Public Health, 492 So.2d 103, 109-10 (La.App. 1st Cir.), writ denied, 494 So.2d 334 (La.1986). Stated differently, "statutes enacted after the acquisition of such a vested property right ... cannot be retroactively applied so as to divest the plaintiff of his vested right in his cause of action because such a retroactive application *1064 would contravene the due process guaranties." Faucheaux, 470 So.2d at 879.
In resolving this issue, the Third Circuit reversed the two-part inquiry required by LSA-C.C. Art. 6, classifying the enactment as substantive, without first ascertaining the legislative intent: "[c]omparative fault is a substantive right and it may not be applied retroactively. Jones v. Gateway Realty, Inc., 550 So.2d 388 (La.App. 3 Cir. 1989), writ den., 556 So.2d 27, 30 (La. 1990)." Cole, 588 So.2d at 384. Continuing, the Third Circuit identified the determinative point when plaintiffs' causes of action accrued, finding: "[t]he record is replete with evidence that plaintiffs' causes of action accrued prior to the Louisiana Comparative Fault Law, effective in 1980." Cole, 588 So.2d at 384.[16] While we do not disagree with the Third Circuit's finding that Act 431 is substantive and that these plaintiffs' causes of action accrued before the Act's effective date, we opt not to hinge our decision on either the Act's classification, or the dates on which plaintiffs' causes of action accrued.[17] Instead, we find dispositive the first part of the LSA-C.C. Art. 6 inquiryÔÇöexpressed legislative intent.
Act 431 contains a clear and unmistakable expression of legislative intent regarding prospective application, providing in Section 4 of the Act that "[t]he provisions of this act shall not apply to claims[18] arising from events that occurred prior to the time this act becomes effective," and in Section 7 of the Act that "[t]he provisions of this Act shall become effective on August 1, 1980." Indeed, the mere inclusion of this type of a provision in a legislative enactment evidences a clear legislative intent that the enactment be given prospective *1065 application. 1A Sutherland Stat. Const.  20.24 (4th Ed.1985).[19]
Louisiana courts have repeatedly recognized the clarity of this statement of legislative intent contained in Act 431 in the context of traditional tort suits in which the tortious conduct and damages coincide. Smiley v. Sikes, 543 So.2d 1084 (La.App.2d Cir.), writ denied, 548 So.2d 326 (La.1989); McDermott v. Jester, 466 So.2d 795 (La. App.4th Cir.), writ denied, 468 So.2d 576 (La.1985); Hyde v. Chevron U.S.A., Inc., 697 F.2d 614 (5th Cir.1983); See Annot., 37 A.L.R.3d 1438 (1971). In that context, Louisiana courts implicitly have equated the term "events" contained in Act 431 with the traditional tort concepts "accident" and "injury," reasoning that when the accident and injury occurred before the Act's effective date, pre-Act law applies. See McDermott, supra.
Consistent with that line of cases, a suggested approach is that we construe the term "events" in Act 431 as encompassing the requisites for asserting a cause of action, which are synonymous with the requisites for a cause of action accruing.[20] Simply put, the requisites for asserting a cause of action are "a wrongful act and resulting damages." Crier, 496 So.2d at 308 (citing Rayne State Bank & Trust Co. v. National Union Fire Insurance Co., 483 So.2d 987, 995 (La.1986)); Lucas v. Commercial Union Insurance Co., 198 So.2d 560, 564-65 (La.App. 1st Cir.1967). The problem with the suggested approach, however, is that the concepts upon which it is based were designed for handling traditional tort suits, and those concepts are inept for identifying the key "events" giving rise to a cause of action for long-term exposure to asbestos in the workplace.
The uniqueness of asbestosis cases and the difficulties of trying to fit such cases within the framework of concepts designed to handle traditional torts has been recognized: "`the factual predicate giving rise to potential liability from asbestos exposure is simply different from those that generated most tort doctrines ... [and thus such cases differ] in legally important aspects from those types of injuries that present tort doctrines were designed to accommodate.' " Ducre v. Mine Safety Appliances, 573 F.Supp. 388, 391 n. 1 (E.D.La. 1983), aff'd in part and rev'd in part, 752 F.2d 976 (5th Cir.), reh'g denied, en banc, 758 F.2d 651 (5th Cir.1985) (quoting Thompson v. Johns-Manville Sales Corp., 714 F.2d 581, 583-84 (5th Cir.1983), cert. denied, 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984) (Goldberg, J. dissenting) and noting that "[o]ccupational diseases of the kind at hand are particularly difficult to classify pragmatically within the structured concepts of traditional tort law").
The difficulties in asbestosis cases arise because, unlike in traditional personal injury cases in which the damage results from a single, identifiable act causing traumatic injury, in asbestosis cases the damage results from a continuous processÔÇöa slow development of this hidden disease over the years. See R.J. Reynolds Tobacco Co. v. Hudson, 314 F.2d 776 (5th Cir.1963).[21] Compounding the problem, asbestosis cases are characterized by a lengthy latency periodÔÇötypically ranging a decade or twoÔÇö and, consequently, a lengthy temporal separation between the tortious conduct and the appearance of injury. See Comment, Liability Insurance For Insidious Disease: Who Picks Up the Tab?, 48 Fordham L.Rev. 657, 665 n. 46 (1980). This lengthy *1066 latency period renders efforts to pinpoint the date on which the disease was contracted virtually impossible, medically and legally. Porter v. American Optical Corp., 641 F.2d 1128, 1133 (5th Cir.), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), reh'g denied, 455 U.S. 1009, 102 S.Ct. 1649, 71 L.Ed.2d 878 (1982); Classen, An Investigation into the Statute of Limitations and Product Identification in Asbestos Litigation, 30 How.L.J. 1, 4 (1987). Further, this inability to pinpoint when injuries were sustained in asbestosis cases renders determining the date on which a plaintiff's cause of action accrued a herculean task.
The issue we must address, therefore, is how to define the relevant "events" in long-latency occupational disease cases for purposes of determining whether pre-Act, or comparative fault, law applies.
Turning to general rules of statutory construction, LSA-C.C. Art. 11 mandates that we give the words the legislature utilizes their generally prevailing meaning. The generally prevailing meaning of the term "event" is a significant happening or occurrence. Webster's Ninth New Collegiate Dictionary (1990); The American Heritage Dictionary of the English Language (1978); Black's Law Dictionary (5th Ed. 1979). Significantly, the term "accident" is synonymous with event, meaning "a fortuitous circumstance, event or happening," "an occurrence, event or happening," or "an unexpected and undesirable event." Webster's, supra; American Heritage, supra; Black's, supra.
While we apparently have never had an occasion to construe the meaning of the term "event," we have had occasion to construe the meaning of the term "accident." Carroll v. International Paper Co., 175 La. 315, 143 So. 275 (1932). In Carroll, supra, the issue before us was the effect of an amendment to a prescription provision of the compensation law changing the wording of the statute from "within one year of the injury" to "within one year of the accident." (emphasis supplied). The amendment was prompted by previous cases in which the term "injury" had been construed broadly as encompassing the injurious results of an accident and in which it was thus found that an action was not barred provided it was brought within a year after the injury manifested itself. Construing the legislative intent in changing the word "injury" to "accident," we held in Carroll, supra, that the legislature meant for prescription to reckon from the date of the physical accident, reasoning that "the word accident does not mean the resulting personal injury, but means the occurrence itself, the happening of which causes the injury." 143 So. at 276.[22]
We conclude that the key relevant events giving rise to a claim in long-latency occupational disease cases are the repeated tortious exposures resulting in continuous, on-going damages, although the disease may not be considered contracted or manifested until later. We further conclude that when the tortious exposures occurring before Act 431's effective date are significant and such exposures later result in the manifestation of damages, pre-Act law applies.
Our reliance on significant, continuous pre-Act exposures as the key factor in determining the applicable law is supported by the empirical evidence. By the 1970's, "it was widely known that prolonged inhalation of asbestos has a high probability of causing damages." Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034, 1045 (D.C.Cir.1981), cert. denied, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875, reh'g denied, 456 U.S. 951, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982). Indeed, the Keene court notes that although asbestosis had been known by man since the early 1900's, it was not until the 1960's, or early 1970's, that the general danger of prolonged exposure to asbestos fibers was fully realized. This realization brought with it dramatic *1067 changes: in 1972, the federal government created the National Institute for Occupational Safety and Health ("OSHA"), and OSHA promulgated stringent guidelines in this area;[23] manufacturers stopped using asbestos in their products;[24] and insurance companies ceased issuing policies that adequately covered asbestos-related diseases.[25]
Our reliance on significant, continuous pre-Act exposures is further buttressed by the holding in Koker v. Armstrong Cork, Inc., 60 Wash.App. 466, 804 P.2d 659 (1991), petition for review denied, 117 Wash.2d 1006, 815 P.2d 265 (1991). In Koker, supra, the Washington appellate court, under very similar facts, relied upon the presence of significant, continuous exposures occurring before the enactment of a similar tort reform statute to reach the same result as we do.
Koker, supra, was a suit by a worker for damages resulting from exposure to asbestos. The plaintiff, Koker, worked as a pipe fitter at a shipyard from 1969 to 1971 and from 1974 to 1986, during which time he was exposed to asbestos-containing products. In 1985, Koker commenced suit against the manufacturers of the asbestos-containing products to which he was exposed. In 1981, the Washington legislature had passed a Tort Reform Act. On appeal from a jury award in Koker's favor, the manufacturers contended that Koker's claim was a product's liability claim arising after the Act's effective date, and, as such, was governed by the Act's provisions. Conversely, Koker contended that his claim arose before the Act and, as such, was governed by pre-Act law.
In addressing this issue, the Koker court looked to the Act's legislative history. The Washington Act, like Act 431, contained an express declaration of legislative intent regarding prospective application, declaring that the Act applies "to all claims arising on or after July 26, 1981," the Act's effective date. The legislative history revealed that as originally drafted the Act employed the word "accruing," which was later changed to "arising."[26] The Koker court found a significant difference in meaning in this context between the terms "arise" and "accrue," stating that "a claim arises when the injury producing event takes place, not when the claim is filed." 804 P.2d at 663.
In resolving the issue in the plaintiff's favor, the Koker court began by noting that "[h]ere, the exposure to the asbestos was in the late 1960's, the 1970's, and 1980's," and in a footnote, noting that "[a]ll parties agree that the degree of exposure was less in the later years with the advent of preventative and precautionary measures." 804 P.2d at 663 n. 4. Based on these findings, the Koker court concluded that pre-Act law applied, reasoning: "[b]ecause the harm here results from exposure (continuous in nature), it appears that substantially all of the events which can be termed `injury producing' occurred prior to the adoption of the Act." 804 P.2d at 663-64.
No one in the instant case contests that the degree of exposure was less in the later years[27] or that the damages in the *1068 instant case resulted from continuous exposures, caused by continuous tortious conduct. Indeed, in this case, such exposures commenced as early as the 1940's, and spanned through the 1950's, 1960's, and 1970's.[28] In summary, we find that substantial injury producing exposures giving rise to plaintiffs' claims occurred before the August 1, 1980, effective date of Act 431, and, therefore, affirm the Third Circuit's holding that the provisions of the Louisiana Comparative Fault Law are inapplicable and that this case is governed by pre-Act lawÔÇöcontributory negligence[29] and virile share principles.[30]

B. VIRILE SHARE APPORTIONMENT OF LIABILITY
As previously noted, the applicable law issue contains a second facet: whether the allocation of fault among the defendants who are found to be solidarily liable should be based on pre-Act law or comparative fault law.[31] The argument raised by the applicants in the companion Champagne case is that regardless of what law we determine applies to plaintiffs' causes of action, a separate determination must be made regarding the law to be applied to defendants' contribution rights; consequently, they argue a finding that precomparative fault law applies to plaintiffs' causes of action does not preclude a finding that defendants' contribution rights are governed by comparative fault law. Stated differently, they argue that contribution is separate and distinct from the underlying tort and that the law in effect at the time the contribution claim comes into existence applies.[32] Relying upon this Court's holding *1069 in Brown v. New Amsterdam Casualty Co., 243 La. 271, 142 So.2d 796 (1962), they argue, supported by the district court,[33] that the defendants' contribution claims came into existence not at the time of the tort, but at the time of plaintiffs' judicial demand, and as plaintiffs' judicial demand was made years after Act 431's effective date, comparative fault law applies in this case.
Conversely, INA argues, supported by the Third Circuit, that the same law that governs plaintiffs' causes of action must govern defendants' contribution rights as contribution is based on subrogation. In a similar vein, plaintiffs concede the Third Circuit's holding that pre-comparative fault law (virile share) governs the apportionment of liability among defendants in this kind of case is correct, but argue that this holding enunciates a "new rule" that should not be retroactively applied to this case as to do so would be unfair.
In finding comparative fault law applicable to the defendants' contribution claims, the trial judge in Champagne relied upon the Fifth Circuit's holding in Cajun Electric Power Cooperative, Inc. v. Owens-Corning Fiberglass Corp., 528 So.2d 716 (La.App. 5th Cir.), writ denied, 531 So.2d 475 (La.1988). In Cajun, supra, the Fifth Circuit, relying on this court's holding in Brown, supra, held that a contribution claim arises at the time of judicial demand. Construing the term "event" in Act 431,[34] the Fifth Circuit found that "the event which triggers the third party claim in contribution is judicial demand against an alleged tortfeasor." 528 So.2d at 723 (emphasis supplied). Finding that the event at issue occurred after Act 431's effective date, the Fifth Circuit held that the defendant's contribution claim against the alleged joint tortfeasor was governed by comparative fault law, relying upon two federal decisions: Ducre v. Executive Officers of Halter Marine, Inc., 752 F.2d 976 (5th Cir.1985), reh'g denied, en banc, 758 F.2d 651 (5th Cir.1985), and Martin v. American Petrofina, Inc., 785 F.2d 543 (5th Cir.1986).
In reversing, the Third Circuit relied upon its recent holding in Lebleu v. Southern Silica of Louisiana, 554 So.2d 852 (La.App. 3rd Cir.1989), writs denied, 559 So.2d 489-91 (La.1990), which was decided about one month after the jury trial in the instant case. Lebleu held that the 1976 amendment to the workers' compensation law could not be applied retroactively to bar a defendant's third-party action for contribution against executive officers where plaintiff's claim for silicosis injury arose prior to 1976, but plaintiff's suit and the third-party demands were not filed until 1984 and 1985. Lebleu expressly rejected the federal court's holding in Ducre, supra, relied upon by the district court in Champagne, as "wrong in overlooking our civil law concept that subrogation of a tort victim's rights to a tortfeasor against other joint tortfeasors arises at the time of the tort. The subrogated tortfeasor steps into the victim's shoes, giving him the substantive right to file a procedural claim for *1070 contribution against other joint tortfeasors." Cole, 588 So.2d at 385.
The Third Circuit also relied upon this court's holding in Perkins v. Scaffolding Rental and Erection Service, Inc., 568 So.2d 549 (La.1990). In Perkins, the Third Circuit noted, this court cited Lebleu with approval in support of its holding that a defendant does not have an independent right to contribution, but is only subrogated to the rights of the plaintiff. Cole, 588 So.2d at 385. Thus, the Third Circuit concluded that the defendants' contribution claims were governed by pre-comparative fault, virile share principles. 588 So.2d at 384-85.[35]
As alluded to earlier, one of the reasons prompting our granting of these applications was to resolve this clear conflict among not only our state courts of appeal, but also among our state and the federal courts on this issue. For the reasons set forth below, we find that the Third Circuit's position is correct, and that the contrary positions set forth by the Fifth Circuit in Cajun and by the federal courts in Ducre and Martin are incorrect. Insofar as Cajun is inconsistent with our holding herein, it is overruled.
The current conflict among the various courts can be traced to a confusion over when a defendant's right to assert a contribution claim arises. Indeed, this confusion can be traced to a misunderstanding of this court's holding in Brown, supra.
The issue in Brown was whether the defendant could assert a contribution claim under the then newly amended LSA-C.C. Art. 2103 and the procedural rules governing third-party practice. Before the 1960 amendment to former LSA-C.C. Art. 2103, a prerequisite to enforcing the right to contribution was a solidary judgment against both tortfeasors.[36] The problem with this rule, however, was that it made the plaintiff the "lord of his action" because it permitted the plaintiff not only to select which joint tortfeasor to sue, but also to determine whether the selected tortfeasor would be entitled to seek contribution from a joint tortfeasor. Comment, Contribution Among Joint Tortfeasors, 22 La.L.Rev. 818, 820 (1962); Comment, Contribution and Indemnity Among Joint Tortfeasors in Louisiana, 5 Loy. L.Rev. 151 (1950).
In an attempt to cure this inequity, the legislature in 1954 enacted the Third-Party Practice Act, which was intended to permit a defendant-tortfeasor to join another joint tortfeasor whom, for whatever reason, the plaintiff had chosen not to sue. This enactment, however, was met with judicial hostility. In Kahn v. Urania Lumber Co., 103 So.2d 476 (La.App. 2d Cir.1958), the Second Circuit construed the Third-Party Practice Act as merely procedural and as affording the defendant no substantive right to enforce contribution. Indeed, Kahn, supra, "stood for the proposition that `there is no right of contribution between joint tort-feasors unless and until they have been condemned in a judgment in solido, and then only in favor of the joint tort-feasor who has paid the damages awarded.'" Perkins, 568 So.2d at 551. To legislatively overrule Kahn, supra, the legislature in 1960 amended former LSA-C.C. Art. 2103 to change the time when a contribution claim could be asserted, allowing a defendant to seek contribution against a joint tortfeasor who had not already been cast in judgment. The effect of this amendment on a defendant's contribution claim filed after the amendment, but arising out of an accident that occurred before the amendment, was the issue before this court in Brown. The court of appeal in *1071 Brown had concluded that the amendment was substantive and therefore could not be retroactively applied. Reversing, this court concluded that the only rights created at the time of the tort, which occurred prior to the amendment, were those between the injured party and the joint tortfeasors. We further stated that "it is only after judicial demand has been made on one of two or more solidarily obligated tort feasors that he can have any possible interest in seeking contribution." Brown, 142 So.2d at 798 (emphasis supplied).
Seizing upon the words "judicial demand," highlighted in the above excerpt from Brown, supra, the First Circuit in Lanier v. T.L. James & Co., 148 So.2d 100, 104 (La.App. 1st Cir.1962), construed Brown, supra, as holding that "the rights of joint tort feasors as between themselves (contribution) arise from judicial demand and not on the date of the commission of the tort." Id.[37]
Propagating this misunderstanding of Brown, supra, the federal Fifth Circuit in Ducre, supra, held that "a tortfeasor's cause of action for contribution against its cotortfeasor, where they are liable in solido, arises, not when the tort occurs but when judicial demand by the injured party is made upon one of the co-tortfeasors." 752 F.2d at 987-88. Further, the federal courts reaffirmed this position in Martin v. American Petrofina, Inc., 785 F.2d 543, 544 (5th Cir.1986).[38]
A proper understanding of the effect of the amendment to former LSA-C.C. Art. 2103 is set forth in Perkins, supra. Perkins holds that although the amendment to former LSA-C.C. Art. 2103 changed the time when a demand for contribution could be procedurally asserted, "[i]t did not affect the substantive basis for seeking contribution set forth in article 1804 [LSA-C.C. Art. 2103's successor], which is subrogation to the rights of plaintiff." 568 So.2d at 551 (citing Lebleu, supra). Indeed, as the Third Circuit noted in Lebleu, supra, the effect of the amendment was merely that "the defendant was no longer at the mercy of the plaintiff's whim as to whether plaintiff may or may not bring in other defendants in the suit." 554 So.2d at 856.
While neither the amendment to former LSA-C.C. Art. 2103, nor the jurisprudence, resolve the issue of when the right to contribution arises, one commentator provides a logical, consistent approach, which we adopt:
[T]he substantive right of action for eventual contribution vests at the time of the delict. This construction would explain how the third party practice is available to the joint tortfeasor sued. Thus the joint tortfeasor has a right of action from the time of the tort, but the cause of action matures only on payment. Thus at the time of the delict there is vested one cause of action and two rights of action: the injured party has a right of action and cause of action in tort against the joint tortfeasors; the joint tortfeasors as between themselves have a right of action or title to sue for contribution which includes the right to use the third party practice. If one of the tortfeasors pays in excess of his virile portion his vested interest or right of action matures and he acquires a separate cause of action for contribution against his fellow tortfeasor.
This reasoning does not contradict the Brown decision. The right of action for contribution in Brown did not vest at the time of the tort because the amended Article 2103 was not yet in effect. On January 1, 1961, the right of action for contribution did vest, along with the *1072 right to use the third party practice. The cause of action for contribution will not accrue or mature, however, until payment of an excess of the virile portion.
Comment, Contribution Among Joint Tortfeasors: Louisiana's Past, Present, and Future, 37 Tul.L.Rev. 525, 532 (1963). We, therefore, conclude that at the time of the tort, obligations arise not only between the injured party and the tortfeasors, but also among the tortfeasors themselves. Id. at 543.
Applying these principles to the instant case, we find that the Third Circuit correctly determined that the contribution rights among the defendants in this case are governed by the same law applicable to the plaintiffs' direct claims. Based on our finding above, we conclude that the allocation of fault among defendants is governed by pre-Act, virile share principles.
We now address plaintiffs' argument that even though the Third Circuit correctly held that pre-comparative fault law governs contribution rights among defendants in this kind of case, this "new rule" should not be retroactively applied in this case. In support of this argument, plaintiffs rely on the theory enunciated by the United States Supreme Court in Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), and adopted by this court in Lovell v. Lovell, 378 So.2d 418 (La.1979), that a judicial decision will be given nonretroactive application when certain factors are present. In Lovell, we enumerated these factors[39] and, applying these factors, we declined to retroactively apply our holding that the alimony statute (former LSA-C.C. Art. 160) was unconstitutional, reasoning that to do so would have an impact on innumerable divorced persons that had relied on the constitutionality of that rule.
In the cases in which courts have declined to give retroactive effect to judicial decisions, the courts have clearly articulated that the principle being announced was one overturning a firmly entrenched rule. Lovell, supra; Kirchberg v. Feenstra, 609 F.2d 727, 735-36 (5th Cir.1979), aff'd, 450 U.S. 455, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981). For instance, in Lovell, supra, we clearly articulated that "[o]ur decision [was one] establish[ing] a new principle of law by overruling clear past precedent on which litigants have relied." 378 So.2d at 422. Similarly, the federal Fifth Circuit in Kirchberg, supra, declined to apply its decision invalidating the community property law head and master concept retroactively, citing two reasons: (i) the concept had been part of Louisiana law since 1808, and (ii) retroactive application "could produce substantial inequable results." 609 F.2d at 735-36. Such is not the case here. Rather, as the Third Circuit correctly concluded, this decision does not change the law; it simply correctly interprets the Civil Code articles on contribution. Cole, 588 So.2d at 385.[40] There is no showing that plaintiffs relied to their detriment on clear past precedent or that any inequity is imposed by application of the correct rule of law to the facts of this case.

III.
Applying virile share principles, the Third Circuit counted twenty virile *1073 shares, comprised of the eleven manufacturer-defendants and the nine Cities Service executive officers. Based on that head count, the Third Circuit reduced each plaintiff's judgment against INA to reflect plaintiffs' settlement and release of the eleven manufacturer-defendants.[41] INA, however, contends that the Third Circuit's calculus was incorrect. More particularly, INA contends that the nine executive officers should be counted as one, collectively comprising a single virile share, because the duty they violated was the single, indivisible obligation of Cities Service to provide a safe workplace under LSA-R.S. 23:13.[42] Plaintiffs counter, supported by the Third Circuit, that treating the executive officers as a single virile share ignores long-standing statutory and jurisprudential principles, including the Louisiana doctrine of solidary liability and LSA-C.C. Art. 2315, which provides that every person is liable for the harm he causes.
INA cites several French commentators for the proposition that a distinction exists between roots and heads of liability and that when the liability of multiple parties derives from a common root, these parties can be grouped as a single virile share. The cited commentators give two illustrations of this grouping principle: spouses in community and co-heirs of a debtor.[43] By analogy, INA argues that since the common root of the nine executive officers' liability is the employer's statutory duty to provide a safe workplace, the executive officers should be grouped as a single virile share. In support of this analogy, INA cites Cassity v. Williams, 373 So.2d 586 (La.App. 3rd Cir.1979), which counted an employee, a vicariously liable employer and its insurer as a single virile share. Cassity, however, is distinguishable from the instant case in that Cassity involved vicarious and derivative liability, a factor clearly lacking in the instant case. Indeed, as discussed below, we have expressly held that an executive officer suit can only be brought for an officer's own personal, as opposed to derivative or vicarious, liability. Canter v. Koehring Company, 283 So.2d 716 (La.1973).
INA also relies upon the Uniform Contribution Among Tortfeasors Act,  2(b), which provides that multiple tortfeasors can be grouped together as a single share if "equity requires." 12 U.L.A. 57, 87 (1975). In this unique setting of long-latency occupational diseases, INA contends that equity requires that the executive officers be grouped together as a single share. Rejecting INA's plea to equity, the Third Circuit reasoned that "[i]n tort cases against executive officers, each negligent executive officer is treated as a separate virile share. Canter v. Koehring Company, 283 So.2d 716 (La.1973); Raley v. Carter, 401 So.2d 1006 (La.App. 1 Cir. 1981)." Cole, 588 So.2d at 385. We agree.
*1074 Canter stands for the proposition that a suit against an executive officer is for his personal, as opposed to derivative, fault. We expressly recognized this distinction in Boyer v. Johnson, 360 So.2d 1164, 1166 n. 1 (La.1978), and find our reasoning in Boyer, supra, controlling:
Prior to Act 147 of 1976, an officer or agent of the employer corporation could be held liable in tort for his own personal fault, notwithstanding the employer's immunity. La.R.S. 23:1101 (prior to 1976 amendment); Canter v. Koehring Co., 283 So.2d 716 (La.1973). [The executive officer] is being sued for his own personal fault in disregarding [certain] statutes, not for imputed or vicarious negligence; whatever his relationship to the employer corporation, he is a distinct person and may be sued as such for his own fault, which occurred prior to the effective date of Act 147 of 1976.
INA also argues that counting each executive officer as a separate virile share allows plaintiffs to creatively name countless executive officers and thereby arbitrarily reduce the manufacturer's liability.[44] This argument ignores the requirement that the allegations of fault against each named executive officer must be proven at trial. Indeed, the fallacious nature of INA's argument is illustrated by the facts in the instant case. While the plaintiffs' petition named seventeen purported executive officers, only eleven executive officers were listed on the special jury interrogatories, and only nine of these were found at fault. For the above reasons, we reject INA's virile share arguments and affirm the Third Circuit's finding that INA is liable for nine virile shares.[45]

IV.
The next issue is whether the coverage provided by INA to the executive officers can be "horizontally stacked."[46] INA contends that the Third Circuit erred in allowing each plaintiff to cumulate or stack the liability limits in each triggered INA policy. More particularly, INA contends that the per accident and/or occurrence primary limits it issued over the years cannot be stacked.[47] Rather, INA submits that its liability should be limited to the highest per accident and/or occurrence limit Cities Service ever purchased of $50,000. INA thus submits that its liability for each plaintiff's judgment should be limited *1075 to the first $50,000, leaving the excess carrier responsible for the remaining $85,000.[48] Conversely, plaintiffs, supported by the district court and the Third Circuit, argue that INA issued over thirty annual policies for which it received a premium and therefore should not be permitted to telescope coverage.
As previously mentioned, the trial judge, pursuant to an agreement among the parties, resolved the insurance coverage issues, rendering written reasons. One of the coverage issues the trial judge addressed was whether INA's obligation should be limited to the highest policy per accident and/or occurrence limit of $50,000. Finding to the contrary, the trial judge concluded that: (i) liability under INA's policies is to be determined on a yearly basis; (ii) INA is at risk for each plaintiff for each period during which that plaintiff was exposed to asbestos; (iii) each plaintiff's damages are attributable to separate, multiple accidents or occurrences; and (iv) more than one INA policy is at risk during the years in which each plaintiff's exposure to asbestos occurred and is thus available to provide coverage.
The Third Circuit, likewise, rejected INA's anti-stacking argument. Based on its review of the record, the Third Circuit found support for the trial judge's conclusion that an accident and/or occurrence took place in each policy year of the plaintiffs' exposure, stating:
Plaintiffs' treating physician, Dr. Gary Friedman, testified that plaintiffs sustained distinct bodily injury in each of their respective years of employment as a consequence of negligent exposure to asbestos dust. Thus, while plaintiffs' continued or repeated exposure may constitute but one occurrence under that policy, the INA grant of coverage and Dr. Friedman's testimony support the trial court's ruling that there was an accident/occurrence in each year of plaintiffs' exposure.
Cole, 588 So.2d at 390. Thus, the Third Circuit, like the district court, found that "stacking the annual policies covering each respective plaintiff's exposure, there is more than sufficient coverage for each plaintiff's recovery awarded." Id.
While we agree with the Third Circuit's resolution of this issue, because of the far-reaching effects of this decision, we nonetheless analyze this issue in-depth. In so doing, we divide the coverage issue before us into two parts: (1) the trigger (or timing) of coverage,[49] and (2) the scope (or stacking) of coverage.[50]

A. THE TRIGGER (OR TIMING) OF COVERAGE
The courts nationwide have split over the proper theory to be applied for determining the trigger of coverage, with three primary theories emerging: (1) the exposure theory;[51] (2) the manifestation theory;[52] and (3) the continuous or triple *1076 trigger theory.[53] As these theories have been the subject of extensive commentary, both judicial and scholarly, we will not prolong this already lengthy opinion by paraphrasing those prior writings, which are cited throughout this opinion. Instead, for the reasons set forth below, we find that the exposure theory is a sound one and adopt that theory as a precept of this court.
Our adoption of the exposure theory is in accord with the federal Fifth Circuit's holding in Porter v. American Optical Corp., 641 F.2d 1128 (5th Cir.), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), reh'g denied, 455 U.S. 1009, 102 S.Ct. 1649, 71 L.Ed.2d 878 (1982), finding, pursuant to Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the exposure theory to be the law of Louisiana. See also Ducre, 752 F.2d at 992 (characterizing Porter, supra, as equating "bodily injury" with exposure). Briefly stated, the exposure theory provides that coverage is triggered by the mere exposure to the harmful conditions during the policy period.[54]
In Porter, supra, the federal Fifth Circuit in adopting the exposure theory incorporated by reference the reasons for adopting that theory set forth in Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir.1980), reh'g granted, in part, clarified, 657 F.2d 814 (6th Cir.), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). In Forty-Eight Insulations, supra, the federal Sixth Circuit gave three reasons why it adopted the exposure theory. First, the exposure theory comports with a literal construction of the policy language: "`[b]odily injury' should be construed to include the tissue damage which takes place upon initial inhalation of asbestos." 633 F.2d at 1223. In so finding, the Court relied heavily on the medical evidence, indicating that "[i]njury, in the sense that there is tissue damage, occurs shortly after the initial inhalation of asbestos fibers.... *1077 [with e]ach additional inhalation of asbestos fibers result[ing] in the build-up of additional scar tissue in the lungs." Id. at 1218. Second, under the facts, the exposure theory would maximize coverage. Id. at 1222. Third, the exposure theory honors the contracting parties' intent by providing for consistency between the insured's tort liability and the insurer's coverage: "The contracting parties would expect coverage to parallel the theory of liability." Id. at 1219. See Comment, Asbestosis: Who Will Pay The Plaintiff?, 57 Tul.L.Rev. 1491, 1506-1507 (1983).[55]
The sound basis underlying the exposure theory was aptly articulated in Commercial Union Insurance Co. v. Sepco Corp., 765 F.2d 1543, 1546 (11th Cir.1985):
[T]he exposure theory is more accurately analyzed as positing not that each inhalation of asbestos fibers results in bodily injury, but rather that every asbestos-related injury results from inhalation of asbestos fibers. Because such inhalation can occur only upon exposure to asbestos, and because it is impossible practically to determine the point at which the fibers actually imbed themselves in the victim's lungs, to equate exposure to asbestos with "bodily injury" caused by the inhalation of the asbestos is the "superior interpretation of the contract provisions." Forty-Eight Insulations, 633 F.2d at 1223.

B. THE SCOPE (OR STACKING) OF COVERAGE
As noted, the scope of coverage refers to the extent of an insurer's obligation once its policy has been triggered. When more than one of a single insurer's policies are triggered, a stacking question arises. 15A Couch on Insurance 2d,  56:34 (1983). And when the triggered policies were issued to the same insured over a horizontal time line, a "horizontal stacking" question arises. Selman, Exposure to a Manifest Injustice: The Argument Against Horizontal Stacking in Latent Injury and Damage Cases, 5 Mealey's Litig. Rep.: Insurance 16, 21 (1990) (hereinafter referred to as "Selman"). As with other insurance coverage disputes, contrary to INA's suggestion, there is no uniformity in the decisions addressing the question of stacking. 8D Appleman, Insurance Law and Practice,  5192 (1981). Indeed, one commentator notes that "[w]hile there is opposition to this practice of `stacking,' the trend today appears in favor of stacking." 2 Freedman, Richards on the Law of Insurance  11.7[b] (6th Ed.1990) (citing Holmes v. Reliance Insurance Co., 359 So.2d 1102 (La.App. 3rd Cir.), writ denied, 362 So.2d 1120 (La.1978), in which the stacking of 160 policies was permitted).[56]
This case presents the res nova issue of whether in a personal injury, asbestos case, multiple policy limits should be available to compensate the injured party. This issue has rarely, if ever, been addressed "because a particular insured defendant in an asbestos case rarely, if ever, [has been] called upon to pay damages to one plaintiff which exceeded the aggregate limit of liability of even one insurance policy triggered under a multiple trigger theory." Selman, supra at 18 (noting that this issue has not arisen in asbestos suits involving "personal injury," as opposed to "property damage," claims); See also Nothstein, Toxic *1078 Torts  21.10, p. 635 (1984) (noting that generally these cases have involved disputes over the trigger, not the scope, of coverage).
INA argues that only one policy limit should be available. INA's anti-stacking argument is built primarily upon language contained in a footnote in Forty-Eight Insulations, supra. Particularly, INA relies upon the following language contained in footnote 28 of that opinion:
The district court recognized the problem which stacking presented. The court stated:
In any event, no insurer should be held liable in any one case to indemnify Forty-Eight for judgment liability for more than the highest single yearly limit in a policy that existed during the period of the claimant's exposure for which judgment was obtained. 451 F.Supp. at 1243.
We agree with the district court. The initial exposure to asbestos fibers in any given year triggers coverage. However, under the terms of the policies, additional exposure to asbestos fibers is treated as arising out of the same occurrence.

Forty-Eight Insulators, 633 F.2d at 1226 n. 28 (emphasis supplied). INA argues, based on the above excerpt, especially the highlighted language, that its liability for each plaintiff should be limited to the per accident and/or occurrence coverage issued in any one policy, despite that it issued over thirty annual policies.
Conversely, in support of their pro-stacking argument, plaintiffs, supported by the Third Circuit and the trial judge, rely upon two cases: Houston v. Avondale Shipyards, Inc., 506 So.2d 149 (La.App.4th Cir.), writ denied, 512 So.2d 459, 460 (La.), reconsideration denied, 513 So.2d 813 (La. 1987); and Ducre v. Mine Safety Appliances Co., 645 F.Supp. 708 (E.D.La.1986), aff'd, 833 F.2d 588 (5th Cir.1987).[57] Plaintiffs point out that in both of these cases, INA's anti-stacking argument was expressly rejected.
In Ducre II, supra, the district court noted that footnote 28 addresses the problem of stacking and avoids ad infinitum coverage by creating a factual fiction "`extending the policy language so that each insurer would face no more liability per claim than the maximum limit it wrote during any applicable year of coverage.'" 645 F.Supp. at 712 (quoting Forty-Eight Insulations, supra); See also Houston, 506 So.2d at 150 (noting "factual construction of a single injury (or reinjury) each year" is adopted to avoid infinite liability exposure). The Ducre II court further found that "in the context of footnote 28, the phrase `each insurer,' means the insurer for any particular year of coverage." 645 F.Supp. at 712. Concluding, the Ducre II court found that the insurer's liability under the policies shall be determined on a yearly basis and that the insurer is at risk for each plaintiff asserting a claim for each policy period during which that plaintiff was exposed. Id. Significantly, the Ducre II court emphasized the payment of annual premiums as a factor supporting its holding: "the fact that [the insurer] issued six separate contracts of insurance to Avondale [the employer], for which Avondale paid separate premiums, is an additional reason for holding that CU is on the risk for each policy issued." 645 F.Supp. at 713.
Relying on this language in Ducre II, supra, plaintiffs, as noted, argue that INA's receipt of annual premiums for over thirty years refutes its attempt to telescope coverage. In contrast, INA, as would be expected, argues that the courts in Ducre II, supra, and Houston, supra, misconstrued Forty-Eight Insulations, supra. More particularly, INA argues that the courts in those cases failed to recognize the distinction between triggering of policies and rendering all of the triggered policies' limits at risk for each claim, i.e., stacking.
*1079 INA's reliance on Forty-Eight Insulations, supra, is misplaced. There, horizontal stacking was not at issue. Indeed, one commentator has cited Forty-Eight Insulations, supra, as an example of why the scope of coverage issue, i.e., stacking, rarely arises in asbestos, bodily injury suits:
[A]s a result of the Insurance Co. of North America v. Forty-Eight Insulations decision cited above, the obligations of Forty-Eight Insulations' insurers were based on the exposure theory. Thus, if a claimant was exposed to the insured's asbestos-containing products over a five-year period, five different insurance policies were triggered. However, Forty-Eight Insulations was one of many defendants, and its part of the settlement never came close to being in the amount of even one aggregate limit of liability.
Selman, supra at 18. Moreover, a pro-stacking argument was advanced by one of the insurers in Forty-Eight Insulations, supra; as noted by a commentator, "the Travelers acknowledged that `the available limit for each policy year of coverage can be stacked.'" Oshinsky, Comprehensive General Liability Insurance: Trigger and Scope of Coverage in Long-Term Exposure Cases, 17 Forum 1035, 1036 n. 3 (1982) (hereinafter "Oshinsky") (quoting from Traveler's brief to the Sixth Circuit in Forty-Eight Insulations, supra).
INA also relies upon Keene, supra, in which footnote 28 of the Forty-Eight Insulations case was construed as permitting the plaintiff to choose the policy with the highest limits and as precluding the plaintiff from horizontally stacking policies. Keene, supra, however, is easily distinguishable because, unlike the instant case in which we apply an exposure theory, the court in Keene adopted and applied the continuous or triple trigger theory. This distinction is significant because the policy considerations underlying the exposure theory, which we adopt and apply herein, are significantly different from the considerations underlying the other trigger theories.
The general economic effect of the exposure theory is to spread losses back over numerous years of primary insurance coverage, with the result that manufacturers, particularly those which are no longer in the asbestos business, will not be faced with increased liability insurance costs. It is also, however, a clear benefit to the more recent excess insurers which will not be forced to make indemnity payments since all applicable primary limits will not be exhausted as rapidly as they would be under a manifestation approach.[58]
Mansfield, Asbestos: The Cases and The Insurance Problem, 15 Forum 860, 877 (1980). Another distinction between these theories is that while the exposure theory attempts to parallel the insurer's coverage with the insured's tort liability, the continuous or triple trigger theory does not. Keene, 667 F.2d at 1051-52.
Significantly, a commentator, critiquing the Keene decision, noted the appropriateness of horizontal stacking in the unique context of asbestos cases:
[The Keene court held that o]nly one policy's limits may apply to each claim, although the court did not address whether this rule applies to claims that might exceed each of the annual policy limits in force during a period of continuing injury. This part of the court's holding is incorrect and probably a moot point in asbestos cases where the claims usually cost each policyholder a sum well within individual insurance limits. However, according to some insurance companies, a "stacking" of limits result would be consistent with the policy language and insurance industry practices.
Oshinsky, supra at 1036 (citing Traveler's brief, discussed above). See also Note, Adjudicating Asbestos Insurance Liability: Alternatives to Contract Analysis, 97 Harv.L.Rev. 739, 743 n. 23 (1984) (noting that while the Keene rule bars stacking of *1080 successive primary policy limits, Ochinsky, supra, suggests that stacking may be possible when a single injury claim exceeds any of the individual policy limits).
Further support for our conclusion that horizontal stacking is appropriate is found in general principles of insurance law. "As a general rule the claimant may recover under all available coverages provided that there is no double recovery." 15A Couch on Insurance 2d,  56:34 (1983); See also 8D Appleman, Insurance Law and Practice,  5192 (1981) (noting that under pro-stacking rule, while an insured may not recover in excess of his actual loss, an insured may recover under each policy providing coverage until the total loss sustained is indemnified). Indeed, it has been suggested that the 1966 revisions to the standard policy language defining an occurrence as "injurious exposure to conditions which results in injury" were intended to mean that "`[i]n some exposure types of cases involving cumulative injuries, it is possible that more than one policy will afford coverage. Under these circumstances, each policy will afford coverage to the bodily injury or property damage which occurs during the policy period.'" Comment, Liability Insurance For Insidious Disease: Who Picks Up the Tab?, 48 Fordham L.Rev. 657, 684 n. 152 (1980) (quoting Elliott, The New Comprehensive General Liability Policy, in Liability Insurance Disputes 12-3, 12-5 (S. Schreiber ed. 1968)); See also Nothstein, Toxic Torts  21.10, p. 635 (1984) (noting that "the intended trigger of coverage is bodily injury occurring during the policy period and that once the policy is triggered, the carrier would be required to pay all sums which the insured may become legally obligated to pay as a result of the underlying toxic tort claim.")
Finally, as suggested by one of the amici, we question whether this case really involves a question of stacking at all. Indeed, the notion that this is not a stacking issue has been recognized, albeit in the context of multiple insurers: "[w]here the damages exceed a single policy limit, it has even been stated that the issue of stacking is not involved. Rather, where separate policies are involved, such a procedure may be essential to enforce contribution between insurers." 8D Appleman, Insurance Law and Practice,  5192 (1981). The same reasoning seems to be applicable here, as the Third Circuit's decision, which we affirm, merely spreads each plaintiff's judgment over the applicable INA policies, thereby, in effect, enforcing INA's contribution rights against itself.

V.
As noted at the outset, we also consider three subsidiary issues raised by plaintiffs' application.[59]

A. EVIDENCE OF PRIOR SETTLEMENTS
Plaintiffs argue that INA failed to present evidence at trial of plaintiffs' pre-trial settlements with the manufacturer-defendants and therefore is precluded from relying upon such settlements to seek a reduction in plaintiffs' recovery. Rejecting plaintiffs' argument, the Third Circuit found that INA was not required to prove the settlements at trial, explaining what transpired:
After trial, defendant filed a motion to correct the record to which plaintiffs filed opposition. Pursuant to a hearing on the motion, the trial judge signed an order correcting the record to show that plaintiffs had settled with and released the eleven defendant manufacturers of asbestos. The final judgment signed by the trial judge states the parties stipulated that the eleven released defendants were legally at fault in causing plaintiffs' injuries, which means no proof was required of INA that the released defendants were at fault.
Cole, 588 So.2d at 383. We agree.
A similar attempt to retract representations made by a party's counsel at a pre-trial conference was rejected in Maurer v. Caballero, 278 So.2d 880 (La.App. 1st Cir. 1973). In Maurer, supra, the defense counsel contended on appeal that the plaintiffs *1081 had failed at trial to prove two elements of their case. Plaintiffs countered that these two elements had been winnowed out at an informal pre-trial conference in the judge's chambers. At oral argument before the appellate court, the defense counsel conceded that he had participated at that pre-trial conference, but indicated that he had no recollection of what had transpired. Finding LSA-C.C.P. Art. 1551[60] controlling, the court of appeal concluded that plaintiffs had the right to assume that the trial judge, as required by LSA-C.C.P. Art. 1551, would, before the case was complete, render an order reciting the agreements and stipulations made between the parties at the pre-trial conference. As the record was devoid of any evidence of what transpired at that conference, the court of appeal remanded for a new trial.
Unlike in Maurer, supra, the trial judge in the instant case complied with the requirements of LSA-C.C.P. 1551, by, at INA's request, rendering an order, before the completion of the case, reciting the agreements and stipulations made among the parties at the pre-trial conference. Indeed, we find the following recitation contained in the trial judge's order dispositive:
That after representing to the Court that he had effected a settlement, plaintiffs' counsel further represented to the Court and all other counsel present that the sole defendant remaining in the litigation, and thus the sole defendant against whom he would continue prosecuting his clients' claims through the trial commencing that morning, was INSURANCE COMPANY OF NORTH AMERICA.
We find that INA was entitled to rely upon that representation. Maurer, supra.

B. PRE-JUDGMENT INTEREST
Another issue raised by plaintiffs' application is whether pre-judgment interest should run from the date plaintiffs filed suit in the present case in state court, as the Third Circuit held, or from the date plaintiffs originally filed suit in federal court, as plaintiffs argue. Initially, plaintiffs each commenced a separate suit in federal court, joining only the manufacturer-defendants. Thereafter, plaintiffs commenced the instant cumulative state court suit, joining INA as a defendant for the first time. The jury found INA and the manufacturer-defendants solidarily liable for plaintiffs' injuries, and the district court rendered judgment awarding legal interest on the damages from the date of judicial demand. On appeal, the Third Circuit amended the district court's judgment to clarify that legal interest was to run from the date of judicial demand in the present case in state court. Plaintiffs argue the Third Circuit erred in failing to find that interest relates back to their judicial demands in federal court.
Similar attempts to have interest in a state court suit relate back to an earlier filed federal court suit have been rejected. See O'Brien v. Delta Gas, Inc., 441 So.2d 802 (La.App. 4th Cir.1983), writ denied, 444 So.2d 1244 (La.1984); Hidalgo v. Dupuy, 122 So.2d 639 (La.App. 1st Cir.1960); Merchant v. Montgomery Ward & Co., 83 So.2d 920 (La.App. 1st Cir.1955). Following those cases, the Third Circuit reasoned that "legal interest is statutory and should be strictly construed, especially where, as here, INA was never a party to the federal lawsuit and was not responsible for the delay in filing suit in state court." Cole, 588 So.2d at 389. While plaintiffs argue that these cases are distinguishable and inconsistent with our later holding in Burton, infra, discussed below, we disagree.
The statutory basis for pre-judgment interest is LSA-R.S. 13:4203, which provides that "[l]egal interest shall attach from date of judicial demand, on all judgments, *1082 sounding in damages, `ex delicto', which may be rendered by any of the courts." Construing this statutory provision, we concluded in Burton v. Foret, 498 So.2d 706 (La.1986), that:
Where defendants are solidarily liable, they are jointly and severally liable for the entire debt, which would include interest from the date on which plaintiff made judicial demand on the first of those parties. Under LSA-R.S. 13:4203, legal interest runs from the date of plaintiff's first judicial claim against all parties responsible for a single tortious occurrence. LSA-C.C.P. art. 1153.
498 So.2d at 712. Our citation to LSA-C.C.P. Art. 1153 in support of this conclusion evidences the limited nature of our holding in Burton, supra. Burton simply stands for the proposition that when an amended petition is filed to add another joint tortfeasor, interest against that tortfeasor runs not from the date of the amendment, but from the date suit was originally commenced in state court. Stated differently, Burton, supra, extends the relation back theory set forth in LSA-C.C.P. Art. 1153, which ordinarily is applied to interrupt prescription, to the pre-judgment interest context.
Plaintiffs argue that Burton, supra, supports a further extension of this concept to previously filed federal court suits against a joint tortfeasor. We find this argument unpersuasive, as did the Third Circuit:
We do not interpret Burton v. Foret, supra as a decision intended by our Supreme Court to extend to the present circumstances. The court specifically cites C.C.P. art. 1153, which provides that an amendment relates back to the date of filing of the original pleading. This was part of the rationale for holding interest ran from the date of the original petition, rather than the date the defendant at issue was added in an amending petition. It is true the court also states that interest runs from the date demand is first made on any solidarily liable defendant. However, in Burton, all demands were made in state court. None had been made in federal court.
Cole, 588 So.2d at 389. Hence, Burton, supra, is limited to the context of a single state court proceeding. See Peacock's, Inc. v. Shreveport Alarm Co., 510 So.2d 387, 390 (La.App. 2d Cir.), writ denied, 513 So.2d 826 (La.1987); and LeBouef v. Gross, 506 So.2d 879 (La.App. 1st Cir.1987) (both these cases apply Burton, supra, in the context of a single state court proceeding). Thus, we affirm the Third Circuit's finding that pre-judgment interest runs from the date of judicial demand in the present suit in state court.

C. HEARSAY OBJECTION
The final issue raised by plaintiffs' application is whether the Third Circuit erred in finding certain of Cormier's medical records[61] admissible under the business record exception to the hearsay rule. LSA-Code of Evid. Art. 803(6). Plaintiffs argue, supported by the district court, that these medical records are inadmissible hearsay because INA failed to lay the necessary foundation required to invoke the business record exception. INA argues, supported by the Third Circuit, that the business record exception applies.
In reversing the district court's exclusion of these medical records as hearsay, the Third Circuit found that a proper foundation had been laid for invoking the business records exception, reasoning:
The records were compiled pursuant to a deposition under written questions directed to Dr. Futrell through his custodian of records.... The written questions propounded to the custodian of records for Dr. Futrell clearly indicated that the records were made by Dr. Futrell in his regular course of business as a provider of medical services. As such, the records are admissible under the business records exception to the hearsay rule. *1083 Cole, 588 So.2d at 387. As these medical records were included in the record by a proffer, the Third Circuit conducted a de novo review and concluded that "[t]hese records do not overcome the testimony of Cormier and his expert medical witnesses as to the physical symptoms suffered by Cormier due to his exposure to asbestos." Cole, 588 So.2d at 388. We find the Third Circuit correctly resolved this issue and reject plaintiffs' argument to the contrary.

VI.
For the assigned reasons, the judgment of the court of appeal is affirmed.
AFFIRMED.
DENNIS, J., concurs with reasons.
DENNIS, Justice, concurring.
I respectfully concur in the majority opinion, although I reach the same result by a somewhat different rationale. In order to set forth my analysis clearly, and to expose any possible flaws in it, I will begin by stating my understanding of the factual and procedural context of the case.
This is a tort suit by plaintiffs, three blue collar workers, against the insurers of nine executive officers of Cities Service, the workers' former employer, for damages due to asbestos injuries and diseases caused by the officers' negligence in providing the workers with an unsafe workplace within which they were exposed to and inhaled asbestos particles from 1945 to 1976. Before trial plaintiffs settled with eleven defendants that were alleged to have been manufacturers of the asbestos materials. The jury found that the nine executive officers had committed harmful negligent acts and omissions as alleged, awarded each plaintiff $300,000, allocated 95% of the fault to the officers and 5% to the manufacturers, and exculpated plaintiffs from any contributory negligence. The trial court applied the Louisiana Comparative Fault Law (hereafter, LCFL) (Act 431 of 1989, effective August 1, 1980) to reduce the awards by 5%. The court of appeal concluded that the law in existence during the workers' exposure from 1945 through 1976, rather than the LCFL, must be applied to apportion liability among the nine executive officer defendants and the eleven manufacturer defendants. Accordingly, the court of appeal modified the judgment to reduce each plaintiff's award by 11/20ths, thus subtracting the virile shares of liability assigned to the eleven asbestos manufacturers with which the plaintiffs settled before trial.
The court of appeal reasoned that, because the LCFL must be applied prospectively and the plaintiffs' causes of action accrued prior to its effective date, the trial court erred in applying the LCFL, rather than pre-LCFL law, in apportioning liability in the present case. I agree with the court of appeal's basic conclusions.
The LCFL must be applied prospectively from its effective date. The LCFL provides that "[t]he provisions of this act shall not apply to claims arising from events that occurred prior to the time this act becomes effective [on August 1, 1980.]" Civil Code art. 6 (1988) provides: "In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary." Therefore, regardless of whether the LCFL is deemed to be a substantive law or not, it must be applied prospectively from its effective date in accordance with the legislative expression. As I interpret the LCFL, it does not apply to claims or causes of actions based on events that occurred prior to August 1, 1980.
The plaintiffs' causes of action accrued prior to the advent of the LCFL in 1980. In fact, all of the events or facts essential to give rise to their causes of action occurred before the legislature amended R.S. 23:1032 to bar such suits against executive officers by Act 147 of 1976 effective October 1, 1976. If that were not the case, the plaintiffs would have been unable even to bring these actions, much less prosecute them to judgment.
The fundamental elements or events upon which a negligence cause of action must be based are fault, causation and *1084 damage. La.Civ.Code arts. 2315 and 2316. Fault that does not cause damage is insufficient to give rise to a cause of action. Owens v. Martin, 449 So.2d 448 (La.1984). The cause of action may arise, however, before the plaintiff sustains all of the damage occasioned by the defendant's negligence. Harvey v. Dixie Graphics, 593 So.2d 351, 354 (La.1992). Any actual harm flowing from the defendant's negligent act or omission establishes a cause of action upon which the plaintiff may sue. Braud v. New England Ins. Co., 576 So.2d 466 (La.1991); Rayne State Bank and Trust Co. v. National Union Fire Ins. Co., 483 So.2d 987 (La.1986); Stone, Tort Doctrine, 12 Louisiana Civil Law Treatise,  12 (1977).
The medical evidence in the present case established that the plaintiffs began to sustain tissue damage shortly after the initial inhalation of asbestos fibers; and that plaintiffs sustained distinct bodily injury in each year of their employment. Because each additional inhalation of asbestos fibers results in the build-up of additional scar tissue in the lungs, it is clear that plaintiffs sustained damage continually during their work from 1945 through 1976. Cf., Ins. Co. of North America v. Forty-Eight Insulations, 633 F.2d 1212, 1218 (6th Cir., 1980). Because the plaintiff workers sustained actual harm to their lungs prior to October 1, 1976, their causes of action based on the executive officers' negligence accrued prior to the effective date of either the LCFL in 1980 or the abolition of executive officer suits in 1976. See Owens v. Martin, supra.
The workers' claims for asbestos injury caused by the defendants' negligence is a delictual action subject to liberative prescription of one year. La.Civ.Code art. 3492 (1983). This prescription commences to run from the day injury or damage is sustained. Id. But there are countervailing factors that may serve to suspend or delay the commencement of prescription. Braud v. New England Ins. Co., supra. Even after damages are sustained and the cause of action accrues, the doctrine of "contra non valentem agere non currit prescriptio" may apply to suspend the running of prescription. Owens v. Martin, supra, at n. 4. Where the cause of action is not known or reasonably knowable by the plaintiff, and his ignorance is not attributable to his own willfulness or neglect, the doctrine applies to suspend prescription. Corsey v. State, 375 So.2d 1319 (La.1979). This doctrine has effects similar to that of the "discovery" rule most courts now apply in cases involving claims for relief based on a disease with a long incubation period, such as asbestosis or mesothelioma; under the "discovery" rule, the statute of limitations does not run until the cause of action accrues, and a cause of action accrues when the plaintiff knows or through the exercise of due diligence should have known of the injury. Wilson v. Johns-Manville Sales Corp., 684 F.2d 111, 115-117, n. 22-32 (D.C.Cir.1982) and authorities cited therein. Indeed, in latent disease cases, such as the present litigation, involving a brief one year prescriptive period and disease latencies as long as 35 years, the operation of a "contra non" doctrine or a "discovery" rule may be essential to avoid a conflict between the prescription statute and the state constitution's "Access to Courts" mandate that: "All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights." La. Const. art. I  22.
It does not follow, however, that once some harm is apparent, the plaintiff is chargeable with knowledge of all the harm that may eventuate in the future as a result of the same conduct. Simply because a plaintiff knows or should know that he has a cause of action seeking damages for asbestosis, for example, does not mean that he knows or through due diligence should know all of the consequences that might develop later, including separate and distinct illnesses such as mesothelioma or another form of cancer. "Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles." Chase Securities Corp. v. Donaldson, 325 *1085 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945). Two basic purposes motivate the drafting and interpretation of statutes of limitations: the evidentiary consideration that relates to the search for truth which may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise; and the objective of repose concerning the potential defendant's interests in security against stale claims and in planning for the future without the uncertainty inherent in potential liability. Wilson v. Johns-Manville, 684 F.2d at 118-119, citing United States v. Kubrick, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979); Chase Securities Corp. v. Donaldson, supra; Order of Railroad Telegraphers v. Railway Express Agency, Inc. 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788 (1944); Kelley, The Discovery Rule for Personal Injury Statutes of Limitations: Reflections on the British Experience, 24 Wayne L.Rev. 1641, 1643-44 (1978); Developments in the Law-Statutes of Limitations, 63 Harv.L.Rev. 1177, 1185-86 (1950).
In asbestos and other latent disease cases, these considerations pull in opposite directions. As the D.C. Circuit Court of Appeals observed: "Repose, beyond question, is best served by [the asbestos manufacturer's] broad definition of the `cause of action' at stake. But in situations involving the risk of manifestation of a latent disease, unlike the mine run of litigation, the evidentiary consideration counsels narrower delineation of the dimensions of a claim. Key issues to be litigated in a latent disease case are the existence of the disease, its proximate cause, and the resultant damage. Evidence relating to these issues tends to develop, rather than disappear, as time passes." Wilson, 684 F.2d at 119.
Moreover, other important interests of the community and the legal system would be undermined by a judge-made rule in latent disease cases that, upon manifestation of any harm, the injured party must then, if ever, sue for all harms the same exposure may or may not occasion some time in the future. Litigation of such contingencies tends to either over or under compensate claimants, rather than to sufficiently, but not excessively, compensate persons for injuries occasioned by the tortious acts of others. The traditional rule, adopted in Louisiana, see Jordan v. The Travelers, 257 La. 995, 245 So.2d 151 (1971); Fish v. Martin, 201 So.2d 341 (La. App. 3d Cir.1967); Adams v. Johns-Manville Sales Corp., 727 F.2d 533, on rehearing 752 F.2d 1004, is that recovery of damages based on future consequences may be had only if such consequences are "reasonably certain." Either that salutary rule would have to be relaxed or abandoned in latent disease cases or an asbestosis victim could never have recovery for cancer unless a lawsuit was filed within one year of the asbestosis discovery and the cancer becomes manifest during the course of the lawsuit. Contrary to the interests of judicial economy a judge-made rule requiring the filing of anticipatory actions will provide a powerful incentive to file precautionary suits although no further disease may ensue and to protract and delay once in court to await the client's medical outcome. For all of these reasons, an asbestosis victim should not be required to file suit for a separate and distinct disease, attributable to the same asbestos exposure, until he knows or through the exercise of due diligence should know, that he has that separate and distinct disease.
Evidently, many of the foregoing considerations have taken root in our current res judicata law also. A judgment is not conclusive between the same parties except as to causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation and except as to any issue actually litigated and determined if its determination was essential to that judgment. La.R.S. 13:4231 (1991). Furthermore, a judgment does not bar another action by the plaintiff when exceptional circumstances justify relief, the first action was dismissed without prejudice or the judgment reserved the right of the plaintiff to bring another action. La.R.S. 13:4232(1)-(3). Thus, unless an asbestosis claimant knew or should have known that *1086 he was also suffering from a separate and distinct disease such as cancer at the time of the judgment and was thus able to assert a second claim, the judgment would not be conclusive as to his right to sue for the separate and distinct disease attributable to the same asbestos exposure. Further, the court has the discretion to grant relief for exceptional circumstances or to reserve the plaintiff's rights to bring another action in cases where he was or may be unsure whether he will suffer future injuries from the event which he is presently litigating, e.g., risk of contracting cancer from exposure to asbestos. La.R.S. 13:4232, commentÔÇö1990, citing Adams v. Johns-Manville Sales Corp., 783 F.2d 589 (5th Cir.1986); Jackson v. Johns-Manville Sales Corp. 781 F.2d 394 (5th Cir.1986).
I concur in the result reached with respect to the trigger of coverage issues, but I am concerned that the court may have stopped short in its consideration and analysis. The exposure theory is clearly superior to the manifestation theory. But the triple-trigger theory appears to set forth an even more comprehensive definition of "injury," encompassing the period from initial exposure to manifestation, because it comports with what is known and unknown about the etiology and progress of diseases. See Keene Corp. v. Ins. Co. of N. America, 667 F.2d 1034, 1057-58 (D.C.Cir.1981) (Wald, J. concurring in part.) Consequently, it should be noted that although the court did not consider the triple trigger thoroughly here, because it would have made no difference, that theory should be reconsidered and applied in future cases in which it produces a more just result.
NOTES
[1] The significance of these issues is evidenced by the numerous amici curiae briefs filed in the instant case, and the avalanche of asbestosis cases that have been filed, and are currently pending, in Louisiana district courts presenting similar issues. The significance of these issues also was noted by Justice Dennis in recommending that we grant writs in a similar case. Lebleu v. Southern Silica of Louisiana, 554 So.2d 852 (La.App. 3rd Cir.1989), writs denied, 559 So.2d 489-91 (La.1990).
[2] 592 So.2d 401 (La.1992).
[3] We also consider three subsidiary issues raised by plaintiffs' application; namely: (1) whether the defendant-insurer failed to present evidence of plaintiffs' prior settlements with the manufacturer-defendants, so as to preclude consideration of those settlements to reduce plaintiffs' recovery; (2) whether pre-judgment interest should run from the date plaintiffs filed the instant state court suit, as the court of appeal held, or from the date of plaintiffs' earlier filed federal court suit, as plaintiffs argue; and (3) whether the court of appeal erred in reversing the trial court's exclusion of certain medical records as hearsay.
[4] This first issue is also raised in the companion case, Champagne v. Celotex Corp., 588 So.2d 391 (La.App. 3rd Cir.1991), writ granted, 592 So.2d 401 (La.1992). Because both cases involve this common issue, the Champagne case was consolidated with the instant case for purposes of oral argument. We render a separate opinion in Champagne today.
[5] As discussed below, "horizontal stacking" of coverage means to combine all available policies, each of which covers a different period of time, to create a larger pool out of which the injured party may be compensated. 2 Freedman, Richards on the Law of Insurance  11.7[b] (6th Ed.1990) and (Cumm.Supp.1992).
[6] While the original petition was filed by seven plaintiffs and included loss of consortium claims brought by all of the plaintiffs' wives, only three plaintiffs' claims were tried; the claims of the remaining plaintiffs and the wives were either severed or dismissed before trial.
[7] The plaintiffs also named Lloyds of London ("Lloyds"), the excess carrier, as a defendant, but plaintiffs subsequently dismissed Lloyds from the suit without prejudice.
[8] Although plaintiffs' petition named thirteen manufacturer-defendants, as discussed below, a pre-trial settlement and stipulation were entered into between plaintiffs and eleven of the manufacturer-defendants, and all of the manufacturer-defendants were dismissed from the suit before trial.
[9] While plaintiffs' petition named seventeen purported executive officers, the special jury interrogatories form only lists eleven, nine of which were found at fault.
[10] As noted elsewhere, the court of appeal corrected the district court's judgment to reflect that one of the plaintiffs, John Perry, did not commence work at Cities Service until 1948.
[11] The judicial development of the contours of executive officer suits and the legislative response in 1976, eliminating such suits in order to close what was perceived as a substantial loophole in the compensation law because it permitted the employer's tort immunity to be circumvented, are discussed in detail in Malone & Johnson, Workers' Compensation, 14 Louisiana Civil Law Treatise,  364 (2d Ed.1980), and Student Symposium, The Work of the Louisiana Legislature for the 1976 Regular Session, 37 La. L.Rev. 89, 182-83 (1976).
[12] The Third Circuit amended the judgment to delete the years 1945, 1946 and 1947 from those in which the executive officers were found liable to plaintiff, John Perry, as Perry did not begin work at Cities Service until 1948.
[13] Act 431 amended and re-enacted LSA-C.C. Articles 2103, 2323 and 2324 to usher into Louisiana a comparative fault system. The Act also amended and re-enacted LSA-C.C.P. Articles 1811 and 1917 to adjust for the changes in the Civil Code articles. Simply put, the Act eliminated the doctrine of contributory negligence and "provide[d] the framework for a comprehensive scheme of loss apportionment in multiple party litigation." Chamallas, Comparative Fault and Multiple Party Litigation in Louisiana: A Sampling of the Problems, 40 La.L.Rev. 373 (1981).
[14] INA contends that this issue is not before this court as neither INA's, nor plaintiffs' application raises the issue. As discussed below, plaintiffs' application raises this issue, albeit in a somewhat oblique manner. Plaintiffs concede in their brief that the Third Circuit's ruling that pre-comparative fault law should apply in this kind of case is correct, but argue that this "new rule" should not be applied in this case. Also, the issue is squarely presented in the companion Champagne case, and, obviously, the resolution of the issue should be the same in both cases.
[15] Under Louisiana law, a cause of action accrues when the party has the right to sue. Trahan v. Liberty Mutual Insurance Co., 314 So.2d 350, 353 (La.1975) ("[t]he cause of action is the state of facts which gives a party a right to judicially assert an action against the defendant"); Louette v. Security Industrial Insurance Co., 361 So.2d 1348, 1350 (La.App. 3d Cir.), writ denied, 364 So.2d 564 (La.1978) (cause of action "accrues" when suit may be legally instituted on it). For a negligence cause of action to accrue, three elements are required: fault, causation and damages. Owens v. Martin, 449 So.2d 448 (La.1984) (citing Seals v. Morris, 410 So.2d 715, 718 (La.1982)); Weiland v. King, 281 So.2d 688 (La.1973). Thus, a sine qua non for accrual of a cause of action is damages. However, "Louisiana is generous in its conception of damages, the slightest being sufficient to support an action." Stone, Tort Doctrine, 12 Louisiana Civil Law Treatise,  12 (1977).
[16] The Third Circuit further found that plaintiffs' causes of action accrued prior to the effective date of the 1976 amendment to the Louisiana Worker's Compensation Law eliminating executive officer suits. Particularly, the Court stated that "[t]he testimony of the medical experts established that plaintiffs contracted asbestos-related disease prior to 1976." Cole, 588 So.2d at 388 (emphasis supplied). See Note 54 of this opinion, discussing the contraction theory, which has been suggested as the appropriate rule in this context for determining when a plaintiff's cause of action accrues. The issue of the applicability of the 1976 amendment in this case, however, is not directly before us, as neither applicant contested the Third Circuit's finding. Nonetheless, we note it is well-settled that this 1976 amendment prohibiting executive officer suits cannot be retroactively applied to divest parties whose causes of action accrued before the amendment was enacted. Thomas v. W & W Clarklift, Inc., 375 So.2d 375, 377 n. 1 (La.1979), Owens v. Martin, 449 So.2d 448 (La. 1984); Boyer v. Johnson, 360 So.2d 1164 (La. 1978); Green v. Liberty Mutual Insurance Co., 352 So.2d 366 (La.App.4th Cir.1977), writ refused, 354 So.2d 210 (La.1978); Quick v. Murphy Oil Co., 446 So.2d 775 (La.App. 4th Cir. 1982), writ denied, 447 So.2d 1074 (La. 1984); Faciane v. Southern Shipbuilding Corp., 446 So.2d 770, 773 (La.App. 4th Cir.1984); See also Malone & Johnson, Workers' Compensation, 14 Louisiana Civil Law Treatise,  364 (2d Ed. 1980) (collecting cases and noting that "legislative amendment prohibiting suits of the executive officer variety is prospective only"); Note, Workmen's CompensationÔÇöRetroactivity of Amendment to Louisiana Workmen's Compensation Statute, 52 Tul.L.Rev. 907 (1978).
[17] While in the instant case it has conclusively been determined that the plaintiffs' causes of action accrued before the Act's effective date, in the companion Champagne case such a factual finding has not been made. Indeed, the Champagne plaintiffs have alleged in their petition exposures straddling the time period before and after the Act's effective date. Pinpointing the accrual date of the Champagne plaintiffs' causes of action if dependent upon the date of their contraction of the disease, the parties correctly contend, would require a hearing and the presentation of extensive medical evidence, and would work administrative havoc on our already burdened court system. It is suggested that for this court to require the parties to engage in such heuristic line-drawing to determine whether pre-Act, or comparative fault, law applies would be wrong. We agree and therefore decline to hinge the applicability of the Louisiana Comparative Fault Law on the date that a plaintiff's cause of action accrued.
[18] In oral argument before this court, counsel for GAF Corporation and Quigley Company, the applicants in the companion Champagne case, argued that what the legislature meant to say was that the Act does not apply to "pending" claims. We decline the suggestion to rewrite this unambiguous statement of legislative intent. See Gamble v. Calcasieu Parish School Board, 139 So.2d 39, 43 (La.App. 3rd Cir.1962) (finding that courts cannot write words into a statute that is clear); LSA-C.C. Art. 9 (mandating that clear and unambiguous laws be applied as written).
[19] See also Commonwealth v. Griffin, 189 Pa.Super. 59, 149 A.2d 656 (1959), cert. denied, 365 U.S. 838, 81 S.Ct. 750, 5 L.Ed.2d 747 (1961) (holding that "an Act which fixes a future day as its effective date stamps its prospective character on its face"); Raymond v. Jenard, 120 R.I. 634, 390 A.2d 358, 359 (1978) (while finding comparative fault law applied retroactively, Rhode Island Supreme Court observed that the comparative fault act as originally drafted provided that the bill would apply only to actions accruing before the act's effective date, and remarked that "[h]ad that language been preserved, we would have little doubt that the Legislature intended prospective application").
[20] Note 15 of this opinion sets forth the requisites for a cause of action to accrue.
[21] An excellent discussion of the nature of asbestos-related diseases is contained in Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1083-85 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).
[22] Interestingly, as a commentator observed, our holding in Carroll, supra, prompted yet another legislative amendment designed to ameliorate the harshness of this rule by preserving for two years from the date of the physical accident the rights of a worker suffering from a latent injury to bring suit for his injuries. Comment, Workmen's Compensation Claimants' Latent or Unknown InjuriesÔÇöPrescription, 12 La.L.Rev. 73, 75 n. 12 (1951).
[23] See Porter v. American Optical Corp., 641 F.2d 1128, 1141 n. 16 (5th Cir.1981), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), reh'g denied, 455 U.S. 1009, 102 S.Ct. 1649, 71 L.Ed.2d 878 (1982) (discussing creation of OSHA, and its promulgation of stringent guidelines).
[24] See Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1215 (6th Cir.1980), reh'g granted, in part, clarified, 657 F.2d 814 (6th Cir.), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981) (noting that by the 1960's, manufacturers began cutting back on the production of asbestos-containing products, and by 1970, Forty-Eight Insulations had stopped using asbestos in its products); See also Keene, 667 F.2d at 1045 n. 22 (noting that by the early 1970's, Keene had stopped using asbestos in its products).
[25] Keene, 667 F.2d at 1045.
[26] Notably, the parallel provision of the Uniform Comparative Fault Act (1979) employs the term "accrue": "This Act applies to all [claims for relief] [causes of action] accruing after its effective date."
[27] Indeed, the decreasing nature of the exposures in the later years was conceded in several of the briefs filed in the instant case and in the companion Champagne case. In any event, we find controlling the empirical evidence, summarized above, that exposure to asbestos had decreased substantially by the 1970's.
[28] In the companion Champagne case, the manufacturer-defendants are still parties to the suit, and the plaintiffs allege in their petition exposures continuing through the 1980's. In this regard, the parties and amid in Champagne raise concerns over whether the provisions of the Louisiana Products Liability Act, LSA-R.S. 9:2800.51-.59, enacted by Act 64 of 1988 and effective September 1, 1988, would apply to the pending claims in the Champagne case. While we note this issue, we refrain from deciding it. We note, however, that several courts have addressed the question of whether that Act should be retroactively applied. Gilboy v. American Tobacco Co., 582 So.2d 1263 (La.1991) (reh'g denied) (finding Act alters substantive rights and is not retroactive); See also Walker v. Babcock Industries, Inc., 582 So.2d 258 (La.App. 1st Cir.1991); Cates v. Sears, Roebuck & Co., 928 F.2d 679 (5th Cir.1991); Horton v. Buhrke, Division of Klein Tools, Inc., 926 F.2d 456 (5th Cir.1991).
[29] As noted by the Third Circuit, contributory negligence was available as a defense to the only defendant in this case, INA, the liability insurer of the executive officers. Several manufacturers and suppliers remain as defendants in the companion Champagne case. Whether contributory negligence or comparative fault is available as a defense to those defendants in the products liability claims asserted against them is an issue not presented or decided in the present case. See Bell v. Jet Wheel Blast, Division of Ervin Industries, 462 So.2d 166 (La. 1985).
[30] As to the Champagne plaintiffs, our finding that pre-Act law applies presupposes that they will be able to prove the allegations in their petition of substantial pre-Act exposures, as was done in Cole.
[31] Act 431 of 1979 (effective August 1, 1980) amended LSA-C.C. Art. 2103, changing the basis of contribution among defendants from virile share to percentage of fault. Act 331 of 1984 (effective January 1, 1985), which rewrote the Civil Code provisions on Obligations, moved the rules regarding contribution contained in former LSA-C.C. Art. 2103 to LSA-C.C. Articles 1804 and 1805. The official revision comments to LSA-C.C. Articles 1804 and 1805 indicate that the revision did not change the law.
[32] The same argument was rejected in Slaughter v. Pennsylvania X-Ray Corp., 638 F.2d 639, 645 (3rd Cir.1981), regarding Pennsylvania's adoption of comparative negligence law. In Slaughter, supra, one of the defendants, while conceding that plaintiff's direct claims were governed by pre-Act law, argued that as contribution is separate and apart from the underlying tort and as its contribution claim did not arise until after the enactment of comparative negligence law, its contribution claim should be governed by comparative negligence law. In rejecting that argument as unpersuasive, the Slaughter court acknowledged that contribution claims differ in nature from the underlying tort action out of which contribution claims arise, but, nonetheless, found the defendant's contribution claim governed by pre-Act law, reasoning:

Joint or several liability is created at the time of the tortious injury, not by subsequent events. The time when the entitlement to contribution comes into being is when the common liability of the tortfeasors to the claimant is extinguished. But the time when that common liability was created was when the tort was committed. Thus, it is the law in effect at the moment of the injury that delineates the responsibilities of the tortfeasors among themselves.
Slaughter, 638 F.2d at 645.
[33] In the instant case, the trial judge submitted the case to the jury with instructions to apply comparative fault law in apportioning liability among the defendants. As discussed below, the trial judge in Champagne, in ruling on INA's pre-trial motion seeking a determination of the applicable law, likewise determined that comparative fault law would govern the allocation of liability among the defendants. As discussed in our opinion which we render in Champagne today, 599 So.2d 1086 (La.1992) INA filed a supervisory writ to the Third Circuit questioning the correctness of that pre-trial ruling. The Third Circuit granted INA's writ and rendered an opinion reversing the trial judge's pre-trial ruling, finding that pre-comparative fault, virile share principles, would govern the allocation of liability among the defendants. Champagne v. Celotex Corp., 588 So.2d 391 (La.App. 3rd Cir. 1991), writ granted, 592 So.2d 401 (La.1992). The correctness of that finding is the sole issue before this court in the companion Champagne case.
[34] As noted above, Section 4 of Act 431 provides that the Act does not apply to "claims arising from events" occurring before the Act's effective date.
[35] The Third Circuit in its separate opinion rendered in the companion Champagne case, likewise, held that "[f]or the reasons stated in Cole, supra," pre-comparative fault principles apply to questions of contribution among the defendants. 588 So.2d at 392.
[36] Quatray v. Wicker, 178 La. 289, 151 So. 208 (1933); Aetna Life Insurance Co. v. DeJean, 185 La. 1074, 171 So. 450 (1936); Sincer v. Bell, 47 La.Ann. 1548, 18 So. 755 (1895); Harvey v. Travelers Insurance Co., 163 So.2d 915, 919 (La.App. 1st Cir.1964) (collecting cases); See Comment, Contribution Among Joint Tortfeasors, 22 La. L.Rev. 818, 819 (1962); Comment, Contribution Among Joint Tortfeasors: Louisiana's Past, Present, and Future, 37 Tul.L.Rev. 525, 529 (1963).
[37] Notably, almost three decades ago, a commentator noted this erroneous interpretation of Brown: "the court in the Lanier case seized upon the words `judicial demand,' which had been used rather loosely in the Brown decision, construing it to say that the right to contribution arises on the filing of the lawsuit." Comment, Contribution Among Joint Tortfeasors: Louisiana's Past, Present, and Future, 37 Tul. L.Rev. 525, 533 (1963).
[38] A commentator noted that this line of federal jurisprudence misconstruing this court's decision in Brown, supra, has created a "pernicious problem" requiring this court's attention. Schewe, Obligations, 47 La.L.Rev. 377, 382 n. 39 (1986).
[39] The three factors looked to in deciding whether a judicial decision should be given nonretroactive effect are as follows: "(1) the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) the merits and demerits must be weighed in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective application will further or retard its operation; and (3) the inequity imposed by retroactive application must be weighed." Lovell v. Lovell, 378 So.2d 418, 421-22 (La.1979).
[40] Rejecting a similar argument raised below, the Third Circuit reasoned: "[p]laintiffs argue Lebleu should not be applied retroactively because it changed established jurisprudence, citing Brown v. New Amsterdam Casualty Company, 243 La. 271, 142 So.2d 796 (1962). Lebleu did not change the law. It interpreted Civil Code articles on contribution. Moreover, we are now bound by Perkins, decided by the Louisiana Supreme Court in 1990." Cole, 588 So.2d at 385.
[41] Under virile share principles, when a plaintiff in a tort action settles with and releases a joint tortfeasor, a trade-off is legally imposed: the plaintiff's recovery against the non-settling tortfeasor is reduced in an amount reflecting the settling tortfeasor's virile share. Harvey v. Travelers Insurance Co., 163 So.2d 915 (La.App. 3rd Cir.1964). The reason for imposing this trade-off is that the settling tortfeasor is insulated from liability for contribution, and the contribution rights of the non-settling tortfeasor are thereby rendered unenforceable and lost. Applying this trade-off in this case, the Third Circuit correctly reduced plaintiffs' judgments against INA by 11/20ths, representing the manufacturer-defendants' virile shares, as the plaintiffs' settlement with the manufacturer-defendants deprived INA of its contribution rights against those defendants.
[42] Alternatively, INA contends that, at most, the executive officers should be counted as four virile shares because at all relevant times the plant safety duty was delegated to only four separate positions: (1) safety manager, (2) plant manager, (3) industrial relations manager, and (4) medical doctor. Stated differently, INA argues that the nine executive officers collectively equal, at most, four virile shares because Cities Service had only four positions identified as having responsibility for employee safety, which four positions at all relevant times were filled by various individuals, including the nine executive officers found at fault.
[43] See 4 C. Aubry and C. Rau, Cours de Droit Civil Francais  298, pp. 12-14, 32-37 (La.St. L.Inst.Trans.1965); 6 C.B.M. Toullier, Le Droit Civil Francais, Nos. 716-18, pp. 746-49 (5th Ed. Paris 1842); 2 M.L. Larombiere, Theorie & Pratique des Obligations, pp. 556-57 (Paris 1857). English translations of the latter two French authorities are contained in the record.
[44] INA still further argues that it is unfair to count each manufacturer as a single virile share, but to count each executive officer as a separate virile share, because manufacturers, like employers, operate through executive officers. This argument, while it has facial appeal, ignores the differing basis of manufacturer and executive officer liability. Compare Canter v. Koehring Co., 283 So.2d 716 (La.1973), and Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).
[45] Nine out of twenty virile shares translates into a reduction of each plaintiff's $300,000 award to $135,000.
[46] The term "horizontal stacking" is defined in Note 5 of this opinion.
[47] By stipulation, it was agreed that INA issued 33 liability insurance policies for yearly terms, insuring Cities Service's executive officers from 1944 to 1976, having per accident and/or occurrence coverages ranging from a low of $10,000 in 1944 to a high of $50,000 in 1976. While INA's policies were not included in the record, a standard policy provision contained in virtually every liability insurance policy written is an agreement by an insurer to pay on an insured's behalf such damages caused by an "accident" during the policy period. Mansfield, Asbestos: The Cases and the Insurance Problem, 15 Forum 860, 875 (1980). In 1966, these policies, referred to generally as comprehensive general liability ("CGL") policies, were revised and standardized. The most significant revision was the conversion of the basis of liability from "accident" to "occurrence" under the standard provision. The disputes over triggering coverage and the scope of coverage are disputes over the construction of this standard provision. As evidenced by the references made in its arguments to the "per accident and/or occurrence" limits of its policies, INA, like other insurers litigating asbestosis cases, does not contend that the 1966 revision has any effect on this dispute. Indeed, "[t]he gravamen of this controversy is not whether the diseases qualify as an `accident' or an `occurrence,' but rather under which policy period the resultant bodily injury occurred." Comment, Liability Insurance For Insidious Disease: Who Picks Up the Tab?, 48 Fordham L.Rev. 657, 667 n. 50 (1980); See also Note, Adjudicating Asbestos Insurance Liability: Alternatives to Contract Analysis, 97 Harv.L.Rev. 739 n. 4 (1984).
[48] As noted earlier, plaintiffs originally joined Lloyds, the excess carrier, as a defendant, but subsequently dismissed Lloyds without prejudice.
[49] Although neither before this court, nor before the Third Circuit have the parties contested the applicability of the exposure theory for determining which of INA's policies are triggered, we find it necessary to resolve this threshold issue before turning to the stacking issue, raised directly by INA's application.
[50] "The trigger of coverage is the event or condition which determines whether a policy responds to a specific claim. The scope of coverage defines the extent of a carrier's obligation once the policy has been triggered." Nothstein, Toxic Torts  21.10, p. 635 (1984).
[51] Under the exposure theory, coverage is triggered by mere exposure to the harmful conditions during the policy period. Forty-Eight Insulations, supra; Porter v. American Optical Corp., 641 F.2d 1128 (5th Cir. 1981), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), reh'g denied, 455 U.S. 1009, 102 S.Ct. 1649, 71 L.Ed.2d 878 (1982); See also Hancock Laboratories, Inc. v. Admiral Insurance Co., 777 F.2d 520 (9th Cir.1985) (adopting exposure theory in negligence suit against manufacturer of a surgically implanted heart valve).
[52] Under the manifestation theory, coverage is triggered only when an injury manifests itself during the policy period. Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co., 523 F.Supp. 110 (D.C.Mass.1981), modified, 682 F.2d 12 (1st Cir.1982), cert. denied, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983) (as modified, holding that coverage is triggered when "asbestos-related disease became reasonably capable of medical diagnosis").
[53] Under the continuous or triple trigger theory, coverage is triggered when the worker was either exposed to asbestos, suffered exposure in residence, or manifested an asbestos-related disease during the policy period. Keene, supra; ACandS, Inc. v. Aetna Casualty and Surety Co., 764 F.2d 968, 972-73 (3rd Cir.1985); See also Lac D'Amiante Du Quebec, Ltee. v. American Home Assurance Co., 613 F.Supp. 1549 (D.C.N.J. 1985) (adopting triple trigger theory in asbestos suit for property damages). As noted in Keene, supra, under this theory the term "bodily injury" is construed to mean "any part of the single injurious process that asbestos-related diseases entail." 667 F.2d at 1047. See also Note 58 of this opinion, indicating that this theory is simply a combination of the exposure and manifestation theories.
[54] Exposure is different from contraction. A contraction theory was enunciated by the Fourth Circuit in Faciane v. Southern Shipbuilding Corp., 446 So.2d 770, 773 (La.App. 4th Cir. 1984), for determining when injury is deemed to occur in long-latency occupational disease cases, deeming injury to occur when "the cumulation of exposure reache[s] the point where the plaintiff contract[s] the disease." More specifically, in Faciane, supra, a silicosis case, the Fourth Circuit explained the contraction theory as follows:

It seems implicit from much of the medical evidence that once silica dust has so damaged and maimed the body that the fibrogenic effects of silica inhalation will progress independent of further exposure, a disease has been contracted. It is at this point and not before that the consequences of exposure to silica becomes inevitable and in our opinion, actionable. The victim's body has been injured just as surely as if it had been hit by a truck.
446 So.2d at 773. In Faciane, supra, an executive officer suit, this theory was crafted to resolve the issue of when the plaintiff's cause of action accrued for purposes of determining the applicable law, as the suit was filed after the adoption of the 1976 amendment to the compensation laws eliminating executive officer suits, but plaintiff contended that his cause of action arose before the amendment. In that context, other Louisiana courts have likewise suggested that the contraction theory is the appropriate rule. Owens v. Martin, 449 So.2d 448 (La.1984); Lebleu, 554 So.2d at 855; Quick v. Murphy Oil Co., 446 So.2d 775 (La.App. 4th Cir.1982), writ denied, 447 So.2d 1074 (La.1984). The contraction theory, however, is fraught with difficulties: "[t]he problem with this approach is that it is extremely difficult to accurately fix the point in time at which the disease is contracted." Faciane, 446 So.2d at 773. Due to these inherent difficulties, we have declined the invitation made by the parties and amici in this case to invoke this theory. We leave for another day, however, resolution of the continued viability of the contraction theory in the context in which it arose. See Note 16 of this opinion, discussing the 1976 amendment eliminating suits of the executive officer variety.
[55] We note that our decision in the instant case, adopting a substantial pre-Act exposure rule for determining the applicable tort law and adopting the exposure trigger theory, likewise is consistent as it invokes the law and it triggers the coverage in effect at the time of the tortious exposures.
[56] In this regard, one commentator has suggested that Louisiana is the only jurisdiction that has expressed serious disagreement with the anti-stacking argument INA advances. Selman, Exposure to a Manifest Injustice: The Argument Against Horizontal Stacking in Latent Injury and Damage Cases, 5 Mealey's Litig.Rep.: Insurance 16, 25 (1990). More particularly, this commentator notes:

While Louisiana jurisprudence often marches to the beat of a drummer that is "tres different," its disagreement with the Keene and INA v. Forty-Eight approach is based on its misreading of those decisions, as well as on a clearly stated agenda to create insurance coverage in the maximum amount. The Louisiana courts confused the issues of multiple triggers and one occurrence versus many occurrences, and came to a legal position that has not been followed by any other court.
[57] For ease of reference and to avoid confusion with Ducre v. Executive Officers of Halter Marine, Inc., 752 F.2d 976 (5th Cir.), reh'g denied, en banc, 758 F.2d 651 (5th Cir.1985), discussed in detail in Section II of this opinion, we refer to Ducre v. Mine Safety Appliances Co., 645 F.Supp. 708 (E.D.La.1986), aff'd, 833 F.2d 588 (5th Cir.1987), discussed in this section of the opinion, Section IV, as Ducre II.
[58] This distinction is also applicable to the continuous or triple trigger theory adopted in Keene, supra, as that theory is simply a combination of the exposure and manifestation theories. Note, Manifestation: The Least Defensible Insurance Coverage Theory for Asbestos-Related Disease Suits, 7 U.Puget Sound L.Rev. 167, 172 (1983).
[59] These three subsidiary issues are set forth in Note 3 of this opinion.
[60] LSA-C.C.P. Art. 1551, which addresses the pre-trial conference, provides in part:

The court shall render an order which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreements of counsel. Such order controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice.
[61] These medical records were from Dr. Futrell, who was the family doctor of Cormier, one of the plaintiffs.