# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 1, 2021

Lyle W. Cayce
Clerk

No. 20-30208

Lisa T. Leblanc,

*Plaintiff*,

*versus*

Texas Brine Company, L.L.C.,

*Defendant*,

_____

Dianne Sanchez; Michael Stewart; Casey Gilliot; Gertrude Sanchez; Justin Frey, et al.,

*Plaintiffs—Appellees*,

*versus*

Texas Brine Company, L.L.C.,

*Defendant—Appellant*,

American Guarantee & Liability Insurance Company; Insurance Company of the State of Pennsylvania; Lexington Insurance Company; Steadfast Insurance Company; Zurich American Insurance Company; AIG Specialty Insurance Company, *formerly known as* American International Surplus Lines Insurance Company, *formerly known as* American International Specialty Lines

No. 20-30208

Insurance Company; National Union Fire Insurance Company of Pittsburgh, Pennsylvania,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:13-CV-5227
USDC No. 2:12-CV-2059

---

Before Barksdale, Southwick, and Graves, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

This diversity action concerns a sinkhole that emerged near the decades-long salt-mining activities of one of the defendants. Affected landowners sued. The appeal before us now involves a settlement by which the plaintiffs would release those insurers of that defendant whose policies covered the period before the sinkhole became obvious. The defendant objected. The objection was rejected, and the district court approved the settlement. We conclude that the defendant has no standing to bring this appeal from the approval of the settlement. The appeal is DISMISSED.

FACTUAL AND PROCEDURAL BACKGROUND

What is called the Bayou Corne sinkhole emerged in Assumption Parish, Louisiana, on August 3, 2012, near the site of Texas Brine's decades-long salt-mining activities. Plaintiffs in this case filed suit against Texas Brine and its insurers, seeking damages for pre-sinkhole subsidence and post-sinkhole stigma damages.

The district court certified a class of plaintiffs, the LeBlanc plaintiffs, on May 28, 2013 (amended April 9, 2014), who eventually reached a

2

No. 20-30208

settlement with Texas Brine and related parties. Thus, the LeBlanc plaintiffs are out of the case. A different class of plaintiffs is involved in this appeal, the Sanchez plaintiffs. The Sanchez plaintiffs are landowners who owned land within a two-mile radius of the sinkhole at the time of or after the sinkhole occurrence. The Sanchez plaintiffs filed their First Amended and Supplemental Class Action Complaint in October 2014 against Texas Brine and Occidental Chemical Corporation, bringing claims for negligence, nuisance, trespass, strict liability, and negligence *per se*.

In December 2014, Texas Brine filed a third-party demand and crossclaim against various insurance companies, including as relevant here Zurich[1] and AIG,[2] which had provided insurance policies to Texas Brine during the periods before the sinkhole emerged. We will refer to these insurers as the "pre-2012 Insurers," because although there was a Zurich policy in effect for part of 2012, there was not one in effect on August 3, 2012, when the surface of the affected property collapsed and formed the sinkhole. The Sanchez plaintiffs filed a Second Amended and Supplemental Complaint in May 2015 in which they alleged that "the mining activities of Defendants caused gradual subsidence [which] . . . damaged Plaintiffs' parcels of land." This complaint asserted direct-action claims against Texas Brine's insurers, including the pre-2012 Insurers. Finally, in their Third Amended and Supplemental Class Action Complaint in September 2015, the Plaintiffs alleged that Defendants' mining activities "caused destabilization

---

[1] Zurich is defined as Zurich American Insurance Company, American Guarantee & Liability Insurance Company, and Steadfast Insurance Company. The latest Zurich policy expired on March 1, 2012.

[2] AIG is defined as National Union Fire Insurance Company of Pittsburgh, Pa., AIG Specialty Insurance Company (formerly American International Surplus Lines Insurance Company), the Insurance Company of the State of Pennsylvania, and Lexington Insurance Company. The latest AIG policy expired on March 1, 2009.

and fracturing of the outer wall of the salt dome and contributed to the fracturing and ultimate collapse of the cavern [which] resulted in ground subsidence and the release of contaminants that damaged Plaintiffs' property."

In summary, then, since 2015 the Sanchez plaintiffs have pursued two sets of claims: claims for damage related to the appearance of the sinkhole on August 3, 2012 (post-sinkhole stigma damage) and claims for subsidence damage occurring before the appearance of the sinkhole (pre-sinkhole subsidence damage). Discovery continued. In June 2018, the district court certified a settlement class for the dismissal of claims against Occidental Chemical and Legacy Vulcan, LLC, which together with Texas Brine had interests in the salt-mining activities.

Also in June 2018, the district court scheduled a bellwether damages trial for December 3, 2018. The court defined the class for the purposes of the bellwether trial as:

> any person or entity who was, at the time of the Bayou Corne Sinkhole, owner of, and any person or entity holding the right to sue on behalf of owners of, uninhabited or undeveloped land, including land with camps or structures that are not occupied as permanent residences, within a two mile radius of the Center Of The Sinkhole.

The parties agreed that the bellwether trial would involve two class properties: the "Hebert tract," co-owned by Michael Landry, and the "Saizon tract," owned by Peggy Saizon. Plaintiffs sought to recover under two theories of damages: (1) "diminution in the value of their land due to the emergence of the Sinkhole" (post-sinkhole stigma damage) and (2) "restoration costs due to pre-Sinkhole subsidence attributable to solution mining" (pre-sinkhole subsidence damage).

Initially, the district court stated in a November 19, 2018 minute entry that "[p]laintiffs waive any claim for restoration damages based on the damage model that involves filling in the Sinkhole itself." Then, in connection with the bellwether trial, Zurich issued a report and prepared a PowerPoint to use at trial that showed a depiction of the approximation of the sinkhole encroaching on the Hebert tract. This was the first evidence of sinkhole encroachment on the Hebert tract. In a later order, the district court clarified that the fill-in-the-sinkhole claim for the Hebert tract was not waived because the bellwether trial would not have resolved the unique-to-him claim to fill in the sinkhole.

Just before the bellwether trial, the Sanchez plaintiffs reached a settlement with the pre-2012 Insurers for claims related to the pre-sinkhole subsidence damage, and the court continued the trial. Under the proposed settlement agreement, the Sanchez plaintiffs agreed to dismiss with prejudice (1) all claims against pre-2012 Insurers and (2) all pre-sinkhole subsidence claims against Texas Brine. In return, the pre-2012 Insurers would pay $1,000,000 to the Sanchez class.

Texas Brine, which was not a party to the settlement, objected to the settlement because it did not release Texas Brine of all plaintiffs' claims against it. The plaintiffs could still pursue claims for post-sinkhole stigma damage and fill-in-the-sinkhole claims against Texas Brine, both of which fit within the "post-sinkhole claims" category. Texas Brine also filed a motion for partial summary judgment that the occurrence of the sinkhole invoked coverage by the "2011 Zurich policy" that was in effect from March 1, 2011, through March 1, 2012.[3] The district court held a fairness hearing on

---

[3] Texas Brine does not argue that the post-sinkhole claims are within the coverage of the AIG policies, the latest of which expired on March 1, 2009.

No. 20-30208

September 19, 2019.  It allowed Texas Brine to be heard on its objection "[w]ithout deciding whether Texas Brine actually satisfie[d] the 'legal prejudice' standard applicable when a non-class member objects to a class settlement."  Then on October 7, 2019, the district court denied Texas Brine's motion for partial summary judgment and denied its objection to the settlement between the Sanchez plaintiffs and the pre-2012 Insurers.  On February 19, 2020, the district court entered its final order and judgment approving the class settlement.  Texas Brine appeals from that order.

## DISCUSSION

We have jurisdiction to review the district court's final order and judgment certifying the settlement class and approving the settlement agreement because the district court determined that there was "no just reason for delay, and . . . [the] Final Order and Judgment is . . . immediately appealable." *See* Fed. R. Civ. P. 54(b); 28 U.S.C. § 1291.  We review the district court's approval of a settlement for abuse of discretion.  *Matter of AWECO, Inc.*, 725 F.2d 293, 297 (5th Cir. 1984).  A jurisdictional question must be answered first — does Texas Brine have standing to object to the settlement?  *See Paterson v. Texas*, 308 F.3d 448, 450 (5th Cir. 2002).

I.      *When can a non-party object to a settlement agreement?*

Standing requires an injury that is concrete and particularized as well as actual or imminent.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "The party invoking federal jurisdiction bears the burden of establishing standing." *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015).  Non-settling parties generally lack standing to object to a settlement agreement. *Transamerican Refin. Corp. v. Dravo Corp.*, 952 F.2d 898, 900 (5th Cir. 1992).

A potential exception exists "if the settlement agreement purports to strip non-settling defendants of rights to contribution or indemnity." *Id.* We have relied on the Seventh Circuit's "plain legal prejudice" formulation to govern when a non-party may object to a settlement agreement, and we do so again here. *Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154, 1164–65 (5th Cir. 1985) ("Although we have not expressly adopted [the plain-legal-prejudice] standard, we think that it has much to recommend it and, moreover, that it comports with the jurisprudence of this circuit." (relying on *Quad/Graphics, Inc. v. Fass*, 724 F.2d 1230 (7th Cir. 1983))); *In re Vioxx Prods. Liab. Litig.*, 388 F. App'x 391, 395 (5th Cir. 2010).[4]  Texas Brine has standing to object to the settlement, then, only if it has suffered plain legal prejudice because of the settlement between plaintiffs and pre-2012 Insurers.

The settlement dismisses with prejudice all claims against the pre-2012 Insurers and dismisses with prejudice all pre-2012 claims against Texas Brine.  It does not, though, release Texas Brine from any claims for damages occurring on or after the appearance of the sinkhole on August 3, 2012. Pursuant to Section 10.3 of the settlement agreement, class members agree that if they settle any claims with Texas Brine, Texas Brine must expressly agree in writing not to seek indemnity or contribution from the pre-2012 Insurers, though Texas Brine may still pursue any bad-faith claims against the pre-2012 Insurers.[5]  This provision affects Texas Brine's ability to seek

---

[4] Although not precedential, *In re Vioxx Products Liability Litigation* shows that we have continued to use the Seventh Circuit's plain-legal-prejudice standard since *Bass*.

[5] The parties contend that whether Texas Brine has suffered plain legal prejudice turns on whether Texas Brine has a right to post-sinkhole coverage under the 2011 Zurich policy.  The question may actually turn on whether Section 10.3 strips Texas Brine of contribution or indemnification rights such that it constitutes plain legal prejudice.  The parties did not focus their arguments on whether, assuming Texas Brine has a right to coverage, Section 10.3 strips them of that right.  Thus, we will resolve Texas Brine's standing by reaching the coverage question rather than Section 10.3's effect on any rights.

No. 20-30208

contribution and indemnification from pre-2012 Insurers, but we have not yet answered whether Texas Brine actually has a right to that contribution or indemnification.

We turn next to the question whether Texas Brine has any rights to contribution or indemnity for post-sinkhole claims from the pre-2012 Insurers that could be affected by the settlement agreement.

II.     *Does Texas Brine have a right to contribution or indemnification from pre-2012 Insurers for post-sinkhole claims?*

The settlement agreement leaves the plaintiffs with claims against Texas Brine for post-sinkhole damages, and it affects Texas Brine's ability to seek indemnification and contribution from the pre-2012 Insurers for those claims. Such a settlement is certainly proper if Texas Brine did not have any right to indemnification or contribution from the pre-2012 Insurers for post-sinkhole damages.

As the court has diversity jurisdiction over the suit, we apply Louisiana law to determine whether Texas Brine has indemnification and contribution rights. Texas Brine, as the party claiming coverage, has the burden of proving that the insurance policy covers its claim. *Gandy v. United Servs. Auto. Ass'n*, 721 So. 2d 34, 36 (La. Ct. App. 1998). The two claims that remain pending and that Texas Brine argues are covered by the policies are (1) the class-wide stigma-damage claims arising out of the decrease in value of properties near the sinkhole because of its emergence and (2) Landry's unique fill-in-the-sinkhole claim. Thus, Texas Brine must show that the 2011 Zurich policy covers these claims to establish standing to object to the settlement agreement.

---

By doing so, we do not intend to disturb any of this court's prior precedents on what separates "plain legal prejudice" from factual injuries.

Under Louisiana law, an insurance policy is a contract for which the extent of coverage is governed by the intent of the parties "as reflected by the words of the policy." *Reynolds v. Select Props., Ltd.*, 634 So. 2d 1180, 1183 (La. 1994). Words in the policy are given "their plain, ordinary and generally prevailing meaning," and "[w]here the language in the policy is clear, unambiguous, and expressive of the intent of the parties, the agreement must be enforced as written." *Id.*

The Zurich policy covered "property damage" that "occur[ed] during the policy period," including "any continuation . . . of that . . . 'property damage' after the end of the policy period." "Property damage" is defined in the policy as "[p]hysical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it." That definition applies to the fill-in-the-sinkhole claim, which arises from a physical injury to tangible property. As relevant to the post-sinkhole stigma damage, "property damage" also includes the "[l]oss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." Moreover an "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The effective policy period was March 1, 2011, to March 1, 2012.

### A.    *Fill-in-the-sinkhole claim*

Landry's unique fill-in-the-sinkhole claim relates to actual "[p]hysical injury to tangible property" and "any continuation . . . of that 'property damage' after the end of the policy period." "All such loss of use [from physical injury to tangible property] shall be deemed to occur at the time of the physical injury that caused it." Texas Brine argues that the physical injury that caused the damage to Landry's tangible property began before the

sinkhole emerged, during the 2011 Zurich policy's coverage period, and it continued after the policy ended, eventually resulting in the sinkhole.

Texas Brine urges us to eschew the concept that the relevant event for coverage under the policy is when the injury became obvious, a causation theory referred to as manifestation theory. Instead, according to Texas Brine, we should consider the evidence that the insured property was already being exposed to the damaging effects of what was occurring below the surface, the exposure theory. A Louisiana court of appeal decision helpfully summarizes those two theories and others as well. *Norfolk S. Corp. v. Cal. Union Ins. Co.*, 859 So. 2d 167, 191 (La. Ct. App. 2003). Under the manifestation theory, coverage under a policy arises on the date that "the injury becomes reasonably apparent or known" regardless of when the injury began. *Id.* There is no evidence that the sinkhole appeared until August 3, 2012. That, then, is the date that the damage "bec[ame] reasonably apparent or known." The 2011 Zurich policy was no longer providing coverage on that date.

The exposure theory would create coverage "by the mere exposure to the harmful conditions during the policy period." *Id.* The exposure theory applies in cases where the "repeated tortious exposure[] result[s] in continuous, on-going damages, although the [injury] may not be considered contracted or manifested until later." *Id.* at 191–92 (citing *Cole v. Celotex Corp.*, 599 So. 2d 1058, 1066 (La. 1992)). In such cases, "damage results from a continuous process — a slow development," where the long-latency period "renders efforts to pinpoint the date" of injury "virtually impossible." *Cole*, 599 So. 2d at 1065–66.

From what we have been able to discern, the concept of coverage at the time of exposure has been applied in cases involving long-latency diseases (*e.g.*, diseases from asbestos exposure) and long-term environmental damage

(*e.g.*, hazardous-waste releases).  Courts applying exposure theory allocate damages "on a *pro rata* basis over all periods in which [harmful occurrences] took place," leaving "each insurer [] responsible, up to the limits of its policy, for all damages emanating from occurrences taking place during the insurer's policy period." *Norfolk S. Corp.*, 859 So. 2d at 198.  Its application to a case such as the one before us is unclear to us.

Even were we to accept Texas Brine's argument that exposure theory applies in this property-damage context, that theory still requires proof of an "occurrence" during the policy period to cause coverage under the policy in effect during that occurrence.  In asbestos cases, for example, the relevant "event" for policy purposes is an exposure to asbestos, "although the disease may not be considered contracted or manifested until later."  *Cole*, 599 So. 2d at 1066.  Though the plaintiff in an asbestos case cannot pinpoint the exact time when the disease was contracted, he can pinpoint exposures to asbestos, the combination of which eventually led to contracting the disease.  *Id.* at 1076–77.  Courts treat the first asbestos inhalation during a policy period as an occurrence that creates coverage under the policy.  *Norfolk S. Corp.*, 859 So. 2d at 192.  Additional exposures during later policies will create coverage under those policies, with compensation being provided *pro rata* across policy periods.  *Cole*, 599 So. 2d at 1078–80.

Regardless of whether such an approach would be applicable here, Texas Brine must have evidence that an actual occurrence, an "exposure," can be found within the policy period.  To that end, the company offered at the fairness hearing an expert in geology and geophysics to determine when surface deformation in Bayou Corne began.  Texas Brine's expert, Dr. William Barnhart, relied on satellite radar of the Bayou Corne area from June 2007 to February 2011 and airborne sensor data from June 2009 to March 2016 to render an opinion about when surface deformation in Bayou Corne began.  His data showed that surface deformation occurred between June 23,

2011, and July 2, 2012, in Bayou Corne.  He opined that the surface deformation occurring at some point in that one-year period was more likely than not related to the formation of the August 3, 2012 sinkhole.  He testified that "it is not possible to determine precisely when the surface deformation associated with the Bayou Corne sinkhole began to form."  He did not even posit that it was more likely than not, based on his expert opinion, that some part of the deformation was occurring before the Zurich policy expired.

AIG's expert also relied on aerial photographs of the Bayou Corne area, to conclude as well that a comparison of the June 23, 2011 data with the July 2, 2012 data showed that the surface deformation began at some point between those dates.

The 2011 Zurich policy expired on March 1, 2012.  Texas Brine has not shown, and admits it cannot show, that what eventually led to the surface deformation had begun before March 1, 2012.  It has provided a one-year period at some point during which the surface deformation began, but it cannot point to when, within that one-year period, it began.  Consequently, there is a gap from March 2, 2012, to July 2, 2012, when the surface deformation could have begun that would not invoke coverage by the 2011 Zurich policy.

Texas Brine has failed to meet its burden to show that the "physical injury that caused" the property damage occurred within the 2011 Zurich policy period.

B.    *Stigma-damage claims*

The stigma-damage claims relate to the second part of the property-damage definition under the 2011 Zurich policy.  They are claims for the "[l]oss of use of tangible property that is not physically injured," specifically, that the sinkhole stigmatized plaintiffs' land and caused a decrease in the value of the land.  The 2011 Zurich policy covers loss-of-use claims, and the

loss-of-use damage is "deemed to [have] occur[ed] at the time of the 'occurrence' that caused it." We agree with the district court's conclusion that the stigma-damage claims relate entirely to the emergence of the sinkhole. It was the "actual catastrophic emergence of the Sinkhole on August 3, 2012," that caused stigma damage to plaintiffs' land, decreasing its value. The after-the-fact discovery of satellite images that showed pre-sinkhole surface deformation to the land is irrelevant to the stigma claims. The land became stigmatized only upon the emergence of the sinkhole; the stigma damage did not begin with the subtle, pre-2012 damage but with the emergence of the sinkhole itself.

* * *

Without establishing that the post-sinkhole claims were covered under the 2011 Zurich policy, Texas Brine has failed to show plain legal prejudice from the settlement agreement. Texas Brine has not shown that it has a right to contribution or indemnification from the pre-2012 Insurers for the post-sinkhole claims. The settlement therefore did not affect any such right. Texas Brine lacks standing as a non-party to object to the settlement. We DISMISS.