# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **6th day of March, 2026** are as follows:

**BY Guidry, J.:**

2025-C-00367    SUCCESSION OF LAURIE MARIA BROCATO (Parish of Orleans Civil)

AFFIRMED. SEE OPINION.

Hughes, J., concurs based on the evidence in the case.
Griffin, J., concurs in the result.

**SUCCESSION OF LAURIE MARIA BROCATO**

On Writ of Certiorari to the Court of Appeal, Fourth Circuit, Parish of Orleans
Civil

**GUIDRY, J.***

We granted certiorari in this matter to consider whether a document written in a bound composition notebook, which bears multiple dates and was signed by the testator at the top of the second of four written pages, meets the form requirements for an olographic testament under La. C.C. art. 1575. Applying La. C.C. art. 1575, as amended in 2025, we find that the four-page document is a valid olographic testament.

**FACTS AND PROCEDURAL HISTORY**

Laurie Maria Brocato ("Decedent") died on October 5, 2021. On March 14, 2022, Decedent's nephew, Brandon Glorioso, petitioned the district court to probate Decedent's November 4, 2019 olographic testament, which left the majority of Decedent's estate, including a home in New Orleans, to Mr. Glorioso. The district court ordered that the November 4, 2019 testament be recorded, filed, and executed by its terms, and Mr. Glorioso ultimately was appointed as executor of Decedent's estate.[1]

Thereafter, on June 28, 2022, Decedent's surviving spouse, Lisa Vickers, filed a petition to revoke and annul the probated testament and to probate an olographic

---

* Judge Allison H. Penzato of the Court of Appeal, First Circuit, appointed Justice pro tempore, sitting for the vacancy in the First District.

[1] Decedent's sister, Barbara Brocato Duvall, was originally appointed as dative independent executrix of Decedent's estate per the terms of the olographic testament, but she was replaced by her son, Mr. Glorioso, due to personal health reasons.

testament dated January 1, 2021, February 1, 2021, and February 2, 2021 ("2021 testament"). Ms. Vickers sought to revoke the November 4, 2019 testament, to have Mr. Glorioso removed as executor and be replaced by Ms. Vickers, and to probate the 2021 testament, which was comprised of four pages in a composition notebook. The 2021 testament revoked all prior testaments and bequeathed Decedent's home in New Orleans and various other property to Ms. Vickers.

Following a hearing, the district court granted Ms. Vickers' petition to revoke, annulling the order probating the November 4, 2019 testament and appointing Mr. Glorioso as executor, and accepted for probate the 2021 testament. The district court found the 2021 testament complied with the date requirement, the signature requirement, and the handwriting requirement for an olographic testament and exercised its discretion under then La. C.C. art. 1575 to accept the 2021 testament in its entirety for probate. In arriving at this conclusion, the district court specifically considered the legislature's intent to change the law and modify the result in *Succession of King*, 595 So. 2d 895 (La. App. 2 Cir. 1992) when it amended La. C.C. art. 1575 in 2001, as well as Decedent's signing the testament at the top of the second page, Decedent's initialing the testament halfway down the second page in the margin, and Decedent's initialing the top of the third page. With regard to the date requirement, the district court found the testament was unambiguously dated in the Decedent's handwriting on January 31, 2021, February 1, 2021, and February 2, 2021, and that a reference to "2-1-2012" in the margin of the second page was clearly an error. Mr. Glorioso and his mother, Barbara Brocato Duvall, appealed from this judgment.

On appeal, the Fourth Circuit Court of Appeal affirmed the district court's judgment. *Succession of Brocato*, 24-0600 (La. App. 4 Cir. 2/26/25), 414 So. 3d 719. The court of appeal noted that the issue before it was limited to whether the 2021 testament met the form requirements of La. C.C. art. 1575, specifically the date

2

and signature requirements. *Succession of Brocato*, 24-0600 at p. 8, 414 So. 3d at 724. The court of appeal noted that the 2021 testament consisted of four consecutive pages in a composition notebook, with the first page being dated January 31, 2021, the second page being dated February 1, 2021, at the top of the page and February 2, 2012, in the left margin, and the third and fourth pages being dated February 2, 2021. *Id.*, 24-0600 at p. 8, 414 So. 3d at 724-25. Applying the version of La. C.C. art. 1575 in effect at that time, the court of appeal found no requirement that an olographic testament be written in its entirety on the same date. *Id.*, 24-0600 at p. 6, 414 So. 3d at 724. The court of appeal further found that the "2-1-2021" date written at the top of the second page was clearly written without any ambiguity and that, considering the consecutive dates on the four pages of the testament and the simple switching of the numbers from "2012" to "2021" in the date in the margin on the second page, there was no error by the district court in concluding that this mistake by the testator did not render the date uncertain so as to invalidate the testament. *Id.*, 24-0600 at pp. 8-9, 414 So. 3d at 725.

As to the signature requirement, the court of appeal noted there was no dispute that the signature and two sets of initials were in the handwriting of the decedent; rather, the issue centered around the location of the signature in the testament and whether that location met the form requirements of La. C.C. art. 1575. *Id.*, 24-0600 at p. 11, 414 So. 3d at 726. At that time, La. C.C. art. 1575 provided "the testator must sign the testament at the end of the testament. If anything is written by the testator after his signature, the testament shall not be invalid and such writing may be considered by the court, in its discretion, as part of the testament." The 2001 revision comments further provided that the 2001 amendment was intended to legislatively change the law so as to modify the result in *Succession of King*, which held that a signature should be at the end of an olographic testament. The court of appeal found the plain text of Article 1575 together with the 2001 Revision

3

Comments lead it to conclude that the signature being located at the end of the testament is not of paramount importance in meeting the form requirements for a valid olographic testament. *Id.*, 24-0600 at pp. 11-12, 414 So. 3d at 726-27. The court of appeal found the district court exercised the discretion provided by the Civil Code to consider the language of the testament that followed the signature and further found Decedent's continued initialing of the testament after her signature supported the district court's finding that the testament was valid and convinced the court of appeal that Decedent intended to write the testament as one document, although drafted over three days. As such, the court of appeal found no error in the district court's decision to give Decedent's intent paramount importance and affirmed the district court's judgment. *Id.*, 24-0600 at p. 12, 414 So. 3d at 727.

**DISCUSSION**

Mr. Glorioso and Mrs. Duvall (Relators) sought review in this court, alleging that the lower courts erred in declining to afford weight to the mandatory language of La. C.C. art. 1575, which required a signature at the end of the testament, and rather, gave the decedent's intent paramount importance in determining the validity of the 2021 testament. However, after Relators' writ application was granted, and prior to oral arguments in this matter, La. C.C. art. 1575 was amended by 2025 La. Acts No. 30 (Act 30), effective August 1, 2025. Louisiana Civil Code article 1575 now provides:

> A. An olographic testament is one entirely written, dated, and signed in the handwriting of the testator. The olographic testament is subject to no other requirement as to form.

> B. The signature may appear anywhere in the testament and is sufficient if it identifies the testator and evidences an intent by the testator to adopt the document as the testator's testament.

> C. The date may appear anywhere in the testament, may be clarified by extrinsic evidence, and is sufficient if it resolves those controversies for which the date is relevant.

4

D. Additions and deletions on the testament made after the execution of the testament may be given effect only if made by the hand of the testator and need not comply with the formalities for the execution of a will or the revocation of a legacy.

Section 4 of Act 30 also provides:

The provisions of this Act apply both prospectively and retroactively and shall be applied to all claims existing and pending on the effective date of this Act and all claims arising or actions filed on or after the effective date of this Act. The provisions of this Act shall not be applied to revive claims prescribed as of the effective date of this Act or to affect claims adjudicated on the merits by a final and definitive judgment prior to the effective date of this Act.

Following the effective date of the amendment, Relators supplemented their original argument, challenging the retroactive application of Act 30 and asserting, even under the amended version of La. C.C. art. 1575, the signature on page two of the testament does not evidence intent on the part of Decedent to adopt the full, whole document as her final testament. Relators further assert that the 2021 testament contains numerous uncertain elements, including incomplete legacies, contradictory provisions, and uncertain usage of dates, which collectively indicate a lack of intent of the Decedent to adopt the whole document as her testament.

At the outset, we note Section 4 of Act 30 specifically states that "[t]he provisions of this Act apply both prospectively and retroactively and shall be applied to all claims existing and pending on the effective date of this Act." This Section clearly and unmistakably evidences the legislature's intent that Act 30 be applied both retroactively and prospectively. Additionally, the parties do not dispute that the instant claim is "pending." Therefore, given the legislature's clear expression of legislative intent regarding the application of Act 30, we conclude that La. C.C. art. 1575, as amended in 2025, applies to the instant matter.[2] *See Cole v. Celotex Corp.*, 599 So. 2d 1058, 1063 (La. 1992); *see also* La. C.C. art. 6.

---

[2] Relators assert in their supplemental brief that if this Court upholds the validity of the 2021 testament, then they formally challenge the retroactive application of Act 30 to the instant matter as unconstitutional because their burden is greatly enhanced. The general rule in Louisiana is that a litigant must raise constitutional attacks in the trial court, not the appellate courts, and the

5

According to La. C.C. art. 1575(A), the only form requirement for an olographic testament is that it be entirely written, dated, and signed in the handwriting of the testator. The proponent of the olographic testament bears the burden of proving that the testament meets this form requirement by producing the testimony of two credible witnesses that the testament was entirely written, dated, and signed in the testator's handwriting. *See* La. C.C.P. art. 2883. "Credible witnesses" include individuals who are familiar with the testator's handwriting as well as handwriting experts. *In re Succession of Plummer*, 37,243, p. 6 (La. App. 2 Cir. 5/14/03), 847 So. 2d 185, 188, *writ denied*, 03-1751 (La. 10/10/03), 855 So. 2d

---

constitutional challenge must be specially pleaded and the grounds for the claim particularized. *See Vallo v. Gayle Oil Co., Inc*. 94-1238, pp. 8-9 (La. 11/30/94), 646 So. 2d 859, 864-865. Furthermore, while there is a recognized exception to this general rule allowing an appellate court to entertain a plea of unconstitutionality when the statute applicable to the specific case becomes effective after the appeal is perfected, *see Unwired Telecom Corp. v. Parish of Calcasieu*, 03-0732, p.7 (La. 1/19/05), 903 So. 2d 392, 399 (on rehearing), we do not find this exception applies in the instant case. This Court examined this exception in *Unwired Telecom Corp.* and found the constitutionality of the Act at issue therein was properly raised when the parties filed briefs in the appellate court and the supreme court fleshing out the various facets of the constitutional issues and, although the constitutional issue was not raised in a pleading, the procedure utilized "met the primary objective of procedural rules relative to pleadings, i.e., it served to fully illumine the substantive legal question under review, focused the parties' attention on the constitutional issues presented, and allowed the appellate court to fully explore and address the constitutional questions urged." *Unwired Telecom Corp.*, 03-0732 at pp. 10-11, 903 So. 2d at 401. However, we do not find that Relators' single sentence in their supplemental brief, as detailed above, meets these basic requirements and does not properly place the constitutional issue before this Court for consideration.

Furthermore, while Relators asserted during oral argument that they have a vested right, which accrued upon the Decedent's death, they failed to present argument as to how retroactive application of Act 30 would violate the constitutional prohibitions against impairment of contractual obligations or disturbance of vested rights. *See Bourgeois v. A.P. Green, Industries, Inc.*, 00-1538, pp. 7 & 9 (La. 4/3/01), 783 So. 2d 1251, 1257 and 1258-59 (noting that the legislature's power to enact retroactive laws is limited by the Due Process and Contract Clauses of the Federal and State Constitutions; thus, even where the legislature has expressed its intent to give a law retroactive effect, the law may not be applied retroactively if it would impair contractual obligations or disturb vested rights). Furthermore, even if this Court applied the due process analysis, there need only be a rational relationship to a legitimate governmental interest to survive due process scrutiny. *See Bienvenu v. Defendant 1*, 23-01194, p. 11 (La. 6/12/24), 386 So. 3d 280, 290. The 2025 Revision Comments state that the legislature changed the law to simplify the execution of olographic wills in Louisiana and to return Louisiana law to the approach traditionally used for nearly two hundred years. 2025 Revision Comment—comment (a). Additionally, the legislature indicates an intent to preserve otherwise valid wills by removing a signature placement requirement, which had precluded courts from considering wills in which the signature was not at the end of the testament but was contained elsewhere in the testament, and removing rigid rules as to how one must sign one's name. *See* La. C.C. art. 1575(B); 2025 Revision Comments—comment (c). Simplifying the execution of olographic wills is rationally related to the state's interest in preserving the validity of wills and avoiding intestacy, and while Relators argued their disagreement with the law, they did not present any argument to dispute this rational basis analysis.

6

323.  The court must satisfy itself, through interrogation or from the written affidavits or the depositions of the witnesses, that the handwriting and signature are those of the testator.  La. C.C.P. art. 2883.

In the instant case, Ms. Vickers, testified that she recognized the handwriting and signature as Decedent's because Decedent was always writing in journals and practicing her handwriting and her signature, and that Decedent had a "very specific signature."  Additionally, Ms. Vickers presented the testimony of Adele Thonn, a handwriting expert and forensic documents examiner, who testified that after reviewing writing samples of the Decedent, there was a "strong probability" that the 2021 testament was drafted and signed by Decedent.  Ms. Thonn stated that "strong probability" was the second highest level of confidence and means the evidence is very persuasive, but some critical factor or quality is missing; however, the examiner is virtually certain that the questioned document and known document are written by the same person. Ms. Thonn further stated that it is acceptable to express a positive identification using the term "strong probability."  The district court specifically found Ms. Vickers and Ms. Thonn to be credible and found Ms. Vickers met her burden of proving the 2021 testament was written, dated, and signed in the handwriting of the testator.  From our review of the record, we do not find any error in this factual determination.

Louisiana Civil Code article 1575 further provides, with regard to the signature and the date, that "[t]he signature may appear anywhere in the testament and is sufficient if it identifies the testator and evidences an intent by the testator to adopt the document as the testator's testament" and "[t]he date may appear anywhere in the testament, may be clarified by extrinsic evidence, and is sufficient if it resolves those controversies for which the date is relevant."  Because Relators' argument regarding Decedent's signature relies in part on there being issues with the dates, we will address the date requirement first.

The first page of the 2021 testament begins "January 31st 2021" and is numbered "pg 1." In the top margin of the second page appears "2-1-2021" and further down the page in the left margin appears "pg2 LB 2-2-2012." In the top margin of the third page appears "pg3 LB 2-2-2021" and further towards the bottom of the third page appears "On 2-2-2021." The next page has a large "X" over the entire, otherwise blank, page, and the top margin of the fourth page states "2-2-2021." The district court and court of appeal found reference to the date "2-2-2012" on the second page, when taken in context with the dates on the other three pages as well as the "2-1-2021" date on the same page, was clearly an error, and even Relators admit in their argument to this court that the 2012 date was likely a scribal error and was meant to communicate 2-2-2021 rather than 2-2-2012. Accordingly, considering that La. C.C. art. 1575 does not require that an olographic testament be written in its entirety on the same date,[3] we find that the 2021 testament contains three consecutive dates on four bound notebook pages, indicating that the testament was written over the course of three days, and therefore, these dates satisfy the date requirement contained in La. C.C. art. 1575(C).

Moving to the signature requirement, Relators assert that it is unclear when the signature on page two of the testament was signed and that the signature does not evidence intent on the part of Decedent to adopt the full, whole document as her final testament. Relators further assert that the 2021 testament contains numerous uncertain elements, including incomplete legacies, contradictory provisions, and uncertain usage of dates, which collectively indicate a lack of intent of the Decedent to adopt the whole document as her testament.

Reviewing the 2021 testament, we note that the first page of the testament starts with the date, January 31st 2021; identifies the testator by full name and date

---

[3] See *Succession of Smart*, 214 La. 63, 68, 36 So. 2d 639, 641 (La. 1948).

of birth; makes testamentary dispositions of her home in New Orleans and her fifty percent interest in a Mercedes to her wife, Ms. Vickers; names Ms. Vickers executor of the testament; and states "this will revokes any & all previous wills." The dispositions run to the bottom of the first page, and the top of the second page begins with the date "2-1-2021," "continued," and Decedent's signature. Accordingly, from our review of the testament, it is clear Decedent signed the testament on February 1, 2021.

The second page continues by stating "I leave my 2012 BMW 24 to" followed by a bequest to Ms. Vickers of Decedent's furniture, electronics, and house contents, with the exception of Decedent's large original art collection. Decedent states she wants her art collection to be given to her close artist friends, and that each friend should have at least three pieces of artwork. Decedent states that Ms. Vickers will retain fifty percent of Decedent's art collection. In the left margin is the notation "pg2 LB 2-2-2012," which date we have already acknowledged was a scribal error and was meant to state 2-2-2021. The bottom of the second page contains another bequest to Ms. Vickers of Decedent's crystal glasses, silver, and china, and "other items," continuing onto the third page with "of value which she wants for herself." Above the continued bequest is the notation "Last will" and "pg3 LB 2-2-2021." Decedent then states that she wants to be cremated, with her urn kept by Ms. Vickers, and specifies that cash in her Chase accounts and her life insurance be distributed: twenty percent to Mr. Glorioso, twenty percent to Mrs. Duvall, twenty percent to Margaret Ryan, and twenty percent to Debbie Conrad. Decedent further states that if Ms. Vickers sells Decedent's house, she wants Mr. Glorioso to receive $25,000, Mrs. Duvall to receive $25,000 "to buy a car," Margaret Ryan to receive $12,000, and Debbie Conrad to receive $12,000 "to buy a reliable vehicle." At the bottom of the page is another notation, "On 2-2-2021," followed by the statement "I am still in Ochsner ICU. My last will and testament." The next page in the notebook is blank

except for a large "X" marked across the page. The fourth and final page has notes in the top margin, apparently unrelated to the testament, such as a reference to two named individuals, the number "315," and "Loveline." Directly under these notes appears the date "2-2-2021" and "I am of sound mind. All art work goes to original friend artists who can share & swap at a wine party at my home …. Each artist will receive five pieces." The page concludes with the name "Lisa," without any further reference.

From our review of the testament, we find Decedent's signature on the top of the second page identifies the testator and, considering the continued language of the testament following Decedent's signature, including several subsequent testamentary dispositions, subsequent and continued references to her "last will," and continued initialing of subsequent numbered pages,[4] we further find Decedent's signature evidences an intent by the testator to adopt the entire document as her testament.

Furthermore, we disagree with Relators' assertion that the 2021 testament contains numerous uncertain elements, including incomplete legacies, contradictory provisions, and uncertain usage of dates, which collectively indicate a lack of intent of the Decedent to adopt the whole document as her testament. We have already addressed Relators' argument regarding any issues with the dates and reject Relators' assertion that the inclusion of multiple dates over four pages in a bound notebook creates any uncertainty. Additionally, we fail to find that the dispositions regarding Decedent's house and her artwork are so contradictory that they create uncertainty indicating a lack of intent by the testator to adopt the whole document

---

[4] We note that the revision makes clear that no rigid rule exists as to how one must sign one's name and adopts a broader definition of "signing" or "signature," which may even include initials, thereby legislatively rejecting, to the extent it may have been applicable by analogy, this Court's holding in *Succession of Frabbiele*, 24-00091 (La. 12/13/24), 397 So. 3d 391. 2025 Revision Comments—comment c.

as her testament.[5] Furthermore, while the testament contains an arguably incomplete legacy by failing to name a legatee for Decedent's 2012 BMW 24, we likewise do not find that this one incomplete legacy creates an uncertainty that evidences a lack of testamentary intent by the testator to adopt the entire document as the testator's testament.[6]

## CONCLUSION

For the foregoing reasons, we find Ms. Vickers has established that the 2021 testament is a valid olographic testament. Accordingly, we affirm the district court's judgment granting Ms. Vickers' petition to revoke, annulling the order that probated the November 4, 2019 testament and appointed Mr. Glorioso as executor and accepting for probate the 2021 testament. We remand this matter to the district court for further proceedings.

**AFFIRMED.**

---

[5] Specifically addressing the two provisions regarding Decedent's house, we note that Decedent initially left her home to Ms. Vickers and subsequently stated later in the testament that "if the house is sold," (not that the house should be sold as argued by Relators), she wanted the money to be distributed to certain named legatees in certain amounts. Accordingly, these two provisions do not appear to be contradictory. However, even if any provisions are ultimately found to be contradictory, we note that when a testament contains contradictory provisions, the one written last prevails. La. C.C. art. 1615.

[6] To the extent this provision may ultimately be determined to be null, we note that the invalidity of a portion of a will does not invalidate the will in its entirety. *See Succession of Wade*, 24-00635, p. 5 (La. 3/21/25), 403 So. 3d 539, 543.